UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEVEN J. PHILLIPS and MARIE CONDOLUCI,
individually and as natural guardians of T.C.P., an
infant,

                              Plaintiffs,

     -v-

COUNTY OF ORANGE, GOSHEN CENTRAL
SCHOOL DISTRICT BOARD OF EDUCATION,
VILLAGE OF GOSHEN, ANDREW SCOLZA, in his
individual and official capacity, JAMIE SCALI-
DECKER, in her individual and official capacity, and
MARY KAY JANKOWSKI, in her individual and
official capacity,

                              Defendants.

Case No. 10-CV-239 (KMK)

<u>OPINION AND ORDER</u>

---

<u>Appearances:</u>

Marie Condoluci, Esq.
Marie Condoluci, PLLC
Goshen, New York
*Counsel for Plaintiffs*

Matthew Joseph Nothnagle, Esq.
Orange County Attorney
Goshen, New York
*Counsel for County Defendants*

Lewis R. Silverman, Esq.
Samantha Velez, Esq.
Rutherford & Christie, LLP
New York, New York
*Counsel for School District Defendants*

Adam I. Kleinberg, Esq.
Anthony Francisco Cardoso, Esq.
Sokoloff Stern LLP
Westbury, New York
*Counsel for Village Defendants*

KENNETH M. KARAS, District Judge:

Plaintiffs Steven J. Phillips and Marie Condoluci (the "Parent Plaintiffs"), suing individually and on behalf of their infant daughter, T.C.P. (collectively, "Plaintiffs"), bring this action against the County of Orange, Jamie Scali-Decker, in her individual and official capacity (the "County Defendants"), the Goshen Central School District Board of Education (the "School District" or the "District"), Mary Kay Jankowski, in her individual and official capacity (the "School District Defendants"), the Village of Goshen, and Andrew Scolza, in his individual and official capacity (the "Village Defendants") (collectively, "Defendants"), alleging that Defendants are liable under 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the Fourth and Fourteenth Amendments. Plaintiffs also claim that the County of Orange, Village of Goshen, and the School District are liable for conspiracy to violate 42 U.S.C. § 1983. Defendants move to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated here in, Defendants' motions are granted in part and denied in part.

## I. Background

### A. Facts

The Court assumes the following facts, as alleged in the Third Amended Complaint ("TAC"), to be true for purposes of deciding the pending motions. On or about October 30, 2009, Theresa Falletta ("Falletta"), the mother of one of T.C.P.'s friends, was in Plaintiffs' home. (TAC ¶¶ 35, 38.) Falletta observed a picture of T.C.P. in a mermaid costume hanging on Plaintiffs' refrigerator, in which T.C.P. was wearing a bikini top and a full length mermaid tail. (*Id.* ¶¶ 39-40.) Falletta inquired where Plaintiffs had bought the costume and how much it had cost, indicating that she wanted one for her daughter as well. (*Id.* ¶¶ 42-44.) Falletta worked

part-time as an officer manager for the Hopewell Presbyterian Church (the "Church") in Thompson Ridge, New York, and was a member of the Church.  (*Id.* ¶¶ 45-46.)  The Church ran a preschool, and thus was provided with a special, unlisted number for mandated reporters of suspected child abuse provided by the State Central Register of Child Abuse and Maltreatment ("SCR").  (*Id.* ¶ 47.)[1]  On or about November 2, 2009, Falletta told Robin J. Hogle ("Hogle"), her co-worker and the Church's pastor, that she was upset to have learned that Phillips, who is Jewish, had been ordained as a minister by the Universal Life Church to perform a wedding ceremony.  (*Id.* ¶¶ 36, 49-50.)  She said that this offended her "as a Christian."  (*Id.* ¶ 50.)  She then told Hogle that Plaintiffs had "inappropriate, provocative photos" of T.C.P. on their refrigerator — referring to the photos of T.C.P. in the mermaid costume — and that Phillips had described the photos as art.  (*Id.* ¶ 51.)  For unknown reasons, Hogle apparently interpreted this comment to mean that Plaintiffs had nude pictures of T.C.P. on their refrigerator.  (*Id.* ¶ 52.)  Falletta also told Hogle that T.C.P. went to the school nurse a lot for no reason, and that Phillips spoke about her body inappropriately and slept with her, while Condoluci slept with their younger daughter, R.S.C.P.  (*Id.* ¶ 53.)  She further expressed concern that T.C.P. was being sexually abused by Phillips and that Condoluci was aware of the abuse and doing nothing.  (*Id.* ¶ 54.)  Hogle had received training from the Church to report all suspicions of child abuse to the

_____

[1] New York Social Services Law establishes the SCR as the entity which receives telephone calls alleging child abuse and maltreatment.  (TAC ¶ 15 (citing N.Y. Soc. Serv. Law § 422(1)).)  New York law, however, distinguishes between calls from mandated reporters and calls from the general public, and "provides for a statewide hotline available to the general public and a 'special unlisted express telephone number' for use only by persons mandated by law to make reports."  (*Id.* ¶ 16 (citing N.Y. Soc. Serv. Law § 422(2)).)  New York Social Service Law provides that telephone calls made by mandated reporters constituting allegations that if true would constitute child abuse "shall constitute a report," and must be transmitted immediately to the local child protective service for investigation.  (*Id.* ¶ 17 (citing N.Y. Soc. Serv. Law § 422(2)(b)).)

SCR, though she did not receive training on the standard of "reasonable cause" to suspect abuse, or on whether she should call the number for mandated reporters or the state's general hotline. (*Id.* ¶¶ 55-56.)[2]

On November 3, 2009 at 8:46 a.m., Hogle called the SCR using the special unlisted telephone number for use only by mandated reporters. (*Id.* ¶¶ 57-58.) However, neither T.C.P., Phillips nor Condoluci had appeared before Hogle in her professional capacity, and thus according to Plaintiffs, she was not a "mandated reporter." (*Id.* ¶¶ 59-60.)[3] Hogle told the SCR that she had learned from "close friends" of Plaintiffs that Plaintiffs have "nude pictures" of T.C.P. on their refrigerator, which they referred to as "art," and that Phillips spoke inappropriately about T.C.P.'s body and slept with her. (*Id.* ¶ 62.) Hogle also reported that Plaintiffs' "close friends" had told her that T.C.P. visits the school nurse a lot and that these friends had "ongoing concerns" about sexual abuse for "about 3 months." (*Id.* ¶ 63.) She further stated that these close friends had witnessed specifics, had confronted Plaintiffs, and may have more details that Hogle could not divulge. (*Id.* ¶ 64.) She, however, refused to reveal Falletta's name, and Plaintiffs claim that this information would have been required of a mandated

---

[2] Mandated reporters are required to call the SCR when they have "reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child, or when they have reasonable cause to suspect that a child is an abused or maltreated child where the parent . . . or other person legally responsible for them comes before them in their professional or official capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child abused or maltreated." (TAC ¶ 18 (citing N.Y. Soc. Serv. Law § 413).) Section 413(1)(a) sets out who is a mandated reporter. Some examples include: physicians, psychologists, licensed mental health counselors, social workers, school officials, camp directors, day care center workers, police officers, and other law enforcement personnel.

[3] Plaintiffs contend that the only time T.C.P. ever came before Hogle in her professional capacity was at a week-long bible camp, during which time Hogle observed no behavior or statements which would suggest the T.C.P. was abused. (*Id.* ¶ 102.)

reporter.  (*Id.* ¶ 66.)[4]  Although the SCR officials initially told Hogle that they did not believe

there was sufficient evidence to take a report, one was nonetheless taken from the call,

containing allegations that Phillips was suspected of sexually abusing T.C.P. and that Condoluci

was an inadequate guardian because of knowledge of the alleged abuse.  (*Id.* ¶¶ 67, 69.)

Plaintiffs maintain that the allegations are false, that Hogle's statements were nothing more than

her hearsay account of someone else's concerns, and that her statements did not amount to

reasonable cause to suspect child abuse.  (*Id.* ¶ 68.)[5]

The report made to the SCR was immediately transferred to the County of Orange

Department of Social Services, Child Protective Services ("CPS").  (*Id.* ¶ 72.)  The report was

made on election day, so T.C.P.'s school and Child Protective Services were both closed.  (*Id.*

¶ 73.)  An after-hours County caseworker, Susan Hughes ("Hughes") followed up on the report

and spoke to Hogle, who informed her that T.C.P. and R.S.C.P. were not in immediate danger.

_____

[4] New York Social Services Law § 413(1)(b) requires that any report made by a mandated reporter include the name and contact information of any staff member who is believed to have direct knowledge of the allegations in the report.

[5] Plaintiffs believe the report was taken — even though Hogle's statements did not create reasonable cause to suspect abuse — because Hogle called the special unlisted number for mandated reporters, and New York Social Services Law § 422(2)(b) requires reports to be taken from mandated reporters if the call contains allegations, which if true, would constitute child abuse.  (TAC ¶ 70.)  Plaintiffs allege that the SCR mistakenly believed that Hogle was a mandated reporter because she had called this special unlisted number.  (*Id.*)  Plaintiffs do not claim that the SCR should have known that Hogle was not a mandated reporter, or that the SCR had any reason to question the accuracy of Hogle's statements.  Plaintiffs do allege, however, that Scali-Decker and Scolza, the CPS caseworker and Village police officer later assigned to the investigation, should have been aware from the contents of Hogle's call, and from subsequent conversations with her, that Hogle was not making the call based on information she learned from coming into contact with T.C.P. or her parents in her professional capacity — a requirement for an individual to be a mandated reporter under § 413.  (TAC ¶¶ 18, 61-69, 95-109.)  Plaintiffs also claim that Scali-Decker and Scolza failed to notice, during the investigation, that Hogle was not a mandated reporter because the County and Village failed to train its employees as to who is a mandated reporter under New York Law.  (*Id.* ¶ 358.)

5

(*Id.* ¶¶ 74-80.)  Hughes' supervisor, Karen Smith ("Smith"), decided that CPS would follow up on the report the following day, and no further action was taken on the report on November 3, 2009.  (*Id.* ¶¶ 79-80, 83.)[6]

Pursuant to New York Social Services Law § 423(6), a social services district may establish a multidisciplinary team to investigate reports of suspected child abuse, and members of this team shall include representatives from CPS, law enforcement, and the district attorney's office.  (*Id.* ¶¶ 20-21.)  On November 4, 2009, CPS, in conjunction with the Village of Goshen Police Department, launched an investigation into the allegations against Plaintiffs.  (*Id.* ¶¶ 84-86.)  The investigation was assigned to Defendants Scali-Decker, a CPS employee, and Scolza, a police officer with the Village of Goshen.  (*Id.*)  Plaintiffs claim that Scali-Decker and Scolza believed that the call had come from a mandated reporter pursuant to § 413, and that neither contemplated contacting Phillips or Condoluci, attempted to corroborate any of the statements made in the report, or considered whether the report contained reasonable cause to suspect that

---

[6] Plaintiffs argue that on November 3, 2009, Smith or Hughes could have sought an order from the Family Court under Family Court Act § 1034 to interview T.C.P., and instead passed on this option because T.C.P. was not in imminent danger and Smith knew that the following day they could interview T.C.P. at school without the need for a court order.  (TAC ¶¶ 81-82.) However, § 1034 specifically applies to a situation where a CPS worker investigating an abuse allegation either cannot locate the child or where the parents deny the CPS worker access to the child.  N.Y. Fam. Ct. Act § 1034(2)(a)(i)(B).  The statute provides that in such a situation, and where there is reasonable cause to suspect abuse, the CPS worker may obtain a court order to require the parents to allow CPS to access to the child to assess his or her safety. § 1034(2)(a)(i). Additionally, Administrative Directive 07-OCFS-ADM-07 of the New York State Office of Children and Family Services, included by Plaintiffs in their opposition papers, describes § 1034 as "affect[ing] the ability of CPS caseworkers to seek court assistance when CPS is denied access to allegedly abused or maltreated children."  (Decl. of Marie Condoluci in Opp'n to Defs.' Mots. to Dismiss, Ex. C at 1.)  The statute does not address situations where access to the child has not been impeded and does not require CPS workers to seek a court order in every instance prior to interviewing a child.

T.C.P. was abused. (*Id.* ¶¶ 87-92.)[7] Scali-Decker then called Hogle, who told her that a close friend of the family had approached her stating that she had concerns about the family for "years," and repeated the other statements that she had made when she made her initial telephone call to the SCR. (*Id.* ¶¶ 96, 99, 104, 106.) Hogle also told Scali-Decker that she was not aware of T.C.P. acting out in any way and that she had interacted with T.C.P. when she was in a week-long bible camp with the Church over the summer. (*Id.* ¶ 101.) Scali-Decker confirmed with Hogle that the report taken by SCR was accurate as to what Hogle was told by Plaintiffs' friend. (*Id.* ¶ 105.) Hogle still refused to provide Falletta's name, and Scali-Decker urged Hogle to have Plaintiff's friend (Falletta) contact her. (*Id.* ¶¶ 98, 107-09.)

Scali-Decker then called T.C.P.'s school, Scotchtown Avenue Elementary School, to confirm that T.C.P. was present in her kindergarten class. (*Id.* ¶¶ 110-11.) Plaintiffs highlight that Scali-Decker made no attempt to corroborate the details from the call, for example by asking whether anyone at the school was concerned about T.C.P., or whether she frequently visited the school nurse. (*Id.* ¶¶ 112-17.) Scali-Decker, Scolza, and Smith held a case conference and determined that T.C.P. would be interviewed at her school regarding the allegations. (*Id.* ¶ 118.) Plaintiffs claim that no effort was made to determine whether the report contained reasonable cause to suspect that T.C.P. had been abused, and that no one involved in the investigation considered contacting the Parent Plaintiffs to get their permission to interview T.C.P. or obtaining a court order to interview her pursuant to Family Court Act § 1034. (*Id.* ¶¶ 119-21.) Plaintiffs further allege that no other course of action was contemplated because it was protocol to always interview the child first — without parental consent or a court order — when

---

[7] However, Plaintiffs do not identify, and the Court has not found, any provision in New York Social Services Law which requires CPS workers who have received a report of alleged abuse to take these steps before interviewing the child who is the suspected victim.

allegations of sexual abuse had been made, regardless of whether the report created reasonable cause to suspect actual abuse. (*Id.* ¶ 125.) Plaintiffs also contend that this protocol was established so that the County and Village could interview children before parents were aware that a report of suspected abuse had even been filed, as parents must be notified of the report within seven days. (*Id.* ¶ 126.)

On November 4, 2009, at approximately 11:49 a.m. Scali-Decker and Scolza arrived at T.C.P.'s school and showed their identification to school authorities. (*Id.* ¶ 127.) Defendant Jankowski, the school social worker, went to T.C.P.'s kindergarten class and removed her for questioning. (*Id.* ¶ 130.) Neither Jankowski nor any other school district employee attempted to determine whether parental consent had been acquired, nor did anyone inquire as to the nature of the allegations. (*Id.* ¶¶ 137-38.) As she removed T.C.P. from her classroom, Jankowski inquired of T.C.P.'s teacher whether she had any reason to believe that T.C.P. had been abused, and the teacher indicated that she did not. (*Id.* ¶¶ 132-33.) Plaintiffs allege that Jankowski did not relay this information to Scolza and Scali-Decker. (*Id.* ¶ 134.) Neither Jankowski nor any other school official had any cause to believe that T.C.P. was abused, and the School District did not inform Scali-Decker and Scolza that T.C.P. had shown no signs of abuse. (*Id.* ¶¶ 131, 139.) Plaintiffs allege that the School District's policy only requires that an employee check the identification of the CPS and law enforcement officers, and have a School District employee present, before allowing for an in-school interview of any student suspected of abuse, regardless of the student's age. (*Id.* ¶¶ 140-41.) This policy allows for such interviews without parental consent or a court order. (*Id.*) Plaintiffs further claim that the School District's policy does not provide for employees to determine whether there are exigent circumstances to justify such an interview, or whether there is even reasonable cause to believe the child has been abused. (*Id.*)

Jankowski escorted T.C.P. to the assistant principal's office to be questioned by Scolza and Scali-Decker. (*Id.* ¶ 135.) Upon arriving at the office, Jankowski told T.C.P. that she "had to" answer questions that would be asked by Scolza and Scali-Decker, and Scali-Decker told T.C.P. that the interview was "like a test." (*Id.* ¶¶ 142, 144.) Jankowski remained in the office, with the door closed, during the questioning. (*Id.* ¶ 143.) At no time did anyone offer to T.C.P. to call her parents or tell her she was free to leave and not answer the questions. (*Id.* ¶¶ 145-46.) T.C.P. was questioned until approximately 12:30 p.m. about various topics, including: (1) whether her parents ever fight; (2) which parent bathed her and how; (3) the family's sleeping arrangements; (4) whether her parents ever spanked her; (5) whether she had ever been alone; (6) whether she had her own room; (7) what types of magazines, movies, and television she watched with her parents; (8) whether either of her parents ever touched her inappropriately; and, lastly (9) whether there were any nude pictures of her in the home.[8] (*Id.* ¶¶ 150, 155-58.) None of T.C.P.'s answers indicated that she had been abused or maltreated in any way. (*Id.* ¶ 161.) Plaintiffs allege that when conducting interviews of a child during an abuse investigation, it is County and Village policy to use a scripted set of questions that probes into all matters of home life, regardless of the nature of the accusations, and regardless of whether the child's answers dispel the suspicion of abuse. (*Id.* ¶¶ 162-64.) After the interview was conducted, Scali-Decker and Scolza spoke to Jankowski about the allegation that T.C.P. visited the school nurse often,

---

[8] Plaintiffs allege that Defendants Scolza and Scoli-Decker arrived at T.C.P.'s school at 11:49 a.m. (TAC ¶ 127.) However, Plaintiffs also allege that T.C.P. was questioned by these Defendants from about 11:49 a.m. to 12:30 p.m., for a total of about 41 minutes. (*Id.* ¶ 150.) Given the series of events that transpired between the arrival of Scolza and Scoli-Decker at Scotchtown Avenue Elementary School and T.C.P.'s arrival at the assistant principal's office to be questioned, it seems possible that at least one of the times given is inaccurate. Thus, the length of time during which T.C.P. was subject to questioning is unclear, but in any event, does not affect the outcome of the pending motions.

and the school nurse confirmed that she had no concerns about T.C.P., and that T.C.P. did not visit her often for unknown reasons. (*Id.* ¶ 165-66.) After the interview, Jankowski asked Scolza and Scali-Decker whether they were planning to notify T.C.P.'s parents about the questioning, and they responded that they would. (*Id.* ¶ 167.) Plaintiffs claim that they never would have consented to two strangers — one of them male — interviewing T.C.P. about intimate matters in school without them present. (*Id.* ¶ 168.)

At approximately 2:15 p.m., Scali-Decker went to Plaintiffs' residence, but no one was home. (*Id.* ¶ 169.) Scali-Decker left her card in the front door of Plaintiffs' house, with a handwritten note on the back to contact her. (*Id.* ¶ 170.) At 2:42 p.m., Scali-Decker called Plaintiffs' residence, but there was still no one at home. (*Id.* ¶ 171.) At about 3:00 p.m., Phillips arrived home and found Scali-Decker's card and immediately called her, but was unable to reach her. (*Id.* ¶¶ 172-74.) Phillips then contacted Condoluci, and the two frantically attempted to reach Scali-Decker, finally reaching her about an hour later at approximately 4:00 p.m. (*Id.* ¶¶ 175-78.) During this conversation, the Parent Plaintiffs first became aware that a report of child abuse had been made against them to the SCR and that T.C.P. had been questioned in school. (*Id.* ¶ 179.) Scali-Decker refused to reveal the nature of the allegations to the Parent Plaintiffs during their phone conversation, because it was protocol to have a law enforcement officer present when those allegations were revealed, only stating that someone had claimed that there were "inappropriate pictures" on Plaintiffs' refrigerator. (*Id.* ¶¶ 180-82.) The Parent Plaintiffs also were told that Scali-Decker and her "partner" (who she did not reveal was a Village police officer) would "have to" observe their two-year-old daughter, R.S.C.P., and interview both of them. (*Id.* ¶¶ 183, 187.) Plaintiffs assert that it was protocol in all investigations regarding suspected child abuse to interview the parents and observe their other

children, regardless of whether the investigation to that point had dispelled the suspicion of abuse. (*Id.* ¶ 184.)  The Parent Plaintiffs claim that they feared that if they did not consent to the interview and observation, Scali-Decker and Scolza would return to T.C.P.'s school to question her again, or attempt to "seize" R.S.C.P. from her preschool, and that they therefore consented to "protect their children from the trauma of further seizures at the hands of Scolza and [Scali-]Decker." (*Id.* ¶¶ 189-90.)

On November 5, 2009, the Parent Plaintiffs brought their two-year-old daughter R.S.C.P. to the County's Department of Social Services office in Goshen. (*Id.* ¶ 191.)  While Plaintiffs were in the waiting area, Scali-Decker received a phone call from Falletta, who refused to provide her name. (*Id.* ¶¶ 193-94.)  Falletta stated that she was a close friend of the family, because her daughter was good friends with T.C.P., and that she was the source of the information provided to Hogle. (*Id.* ¶¶ 196-97.)  Falletta further stated that she was hesitant to identify herself, out of concern that she would "have an issue with Phillips and Condoluci" and out of fear of confrontation with the family, contradicting her earlier statements to Hogle that she had confronted Phillips with her concerns of abuse. (*Id.* ¶¶198-99.)  She stated that T.C.P. is "very smart" and that she had no knowledge of T.C.P. ever acting out sexually, or disclosing inappropriate actions by her father. (*Id.* ¶¶ 200-01.)  Falletta further told Scali-Decker that T.C.P. slept every other night with Phillips, and that the parents took turns sleeping with R.S.C.P., again contradicting her earlier statements. (*Id.* ¶ 202.)  She also stated that Phillips made comments, as a "joke" that people think that he is a sexual predator, that she once observed Phillips put on his turn signal to turn into a nude bar when he had T.C.P. and Falletta's daughter in his car, and that another anonymous person got a "sick feeling" from Phillips and would not

leave his child alone with Phillips.  (*Id.* ¶¶ 203, 205, 209.)[9]  When Scali-Decker asked Falletta

about the "nude pictures" of T.C.P., Falletta told her that there were pictures of T.C.P. in a

mermaid costume hanging on the refrigerator, and that the costume looked like it came from

"Frederick's of Hollywood."  (*Id.* ¶¶ 211-12.)  Falletta also told Scali-Decker that Condoluci had

approached her and asked if Falletta thought that Phillips acted inappropriately, and Falletta

should have raised her "concerns" then, but had not.  (*Id.* ¶ 213.)[10]  Falletta also stated that

Condoluci had called her upset that T.C.P. had been questioned in school, and when Condoluci

asked Falletta if she had made the call to the SCR, Falletta denied it.  (*Id.* ¶¶ 217-18.)  Plaintiffs

claim that Condoluci also asked Falletta if she made any statements to anyone that could have

caused the call to the SCR, which Falletta denied.  (*Id.* ¶¶ 219-20.)  Plaintiffs state that by this

point, Scali-Decker should have known that Falletta was unreliable, because two of the

statements she made to Hogle — about the nude photo and the school nurse — had already been

proven false.  (*Id.* ¶ 195.)

After finishing the call with Falletta, Scali-Decker came to the waiting room and asked

Phillips to accompany her alone, stating that is was protocol to interview the parents separately.

(*Id.* ¶¶ 221-22.)  Phillips was brought to an interview room with Scali-Decker and Scolza, with

the door closed, and no one informed him that Scolza was a police officer.  (*Id.* ¶¶ 224-25.)

Scolza explained the allegations to Phillips, who was outraged, and who denied vehemently all

allegations of wrongdoing.  (*Id.* ¶¶ 226-36.)  After this, Scali-Decker brought Condoluci and

---

[9] Plaintiffs deny Philips ever joking about people thinking he is a sexual predator.  (*Id.* ¶ 204.)  Plaintiffs also clarify that the incident with the turn signal happened when Phillips knew that Falletta was behind him (he had T.C.P. and Falletta's daughter in his car, and Falletta was following him so they could all meet at a McDonald's after ice skating practice), and that he had put his turn signal on as a joke, and never in fact pulled into a nude bar.  (*Id.* ¶¶ 206-08.)

[10] Plaintiffs deny that this ever happened.  (*Id.* ¶ 214.)

R.S.C.P. into the room, and again did not identify Scolza as a police officer. (*Id.* ¶¶ 237-38.) The first thing that Scali-Decker and Scolza asked Condoluci was whether anybody "had it in for them." (Id. ¶ 239.) Condoluci denied that either of her children was abused or neglected in any way, and denied any inappropriate language or sexual acts in her home. (*Id.* ¶ 241.) Condoluci, an attorney, also complained that T.C.P. had been questioned without any attempt to gauge the credibility of the anonymous caller or the caller's source, or any attempt to notify Plaintiffs or obtain their consent. (*Id.* ¶¶ 240, 242.) Scali-Decker responded, saying that "we do it all the time" and that it was "protocol" to not contact parents or obtain consent before going to a school to interview a child. (*Id.* ¶ 243.) Scolza stated that the rationale for this "protocol" was to avoid difficulties in the investigation arising from having children coached by their parents, and that innocent parents should not be concerned when their children are questioned without consent because "they have nothing to hide." (*Id.* ¶¶ 244-45.) Scali-Decker asked to see the pictures of T.C.P. in the mermaid costume, which Plaintiff showed to her. (*Id.* ¶¶ 246-47.) Scali-Decker first asked where Plaintiffs had purchased the costume. (*Id.* ¶ 248.) Then, Scali-Decker noted that all of T.C.P.'s private parts were covered, that she looked happy in all the photos, and that the photos did not appear provocative or inappropriate in any way. (*Id.* ¶¶ 249-50.) Scali-Decker also asked if Plaintiffs slept with their children, noting before they could answer, "who doesn't," and that sleeping with your children "doesn't mean anything." (*Id.* ¶¶ 252-53.) Condoluci answered that both she and Phillips slept with the children. (*Id.* ¶ 254.) During the interview, Scali-Decker and Scolza observed R.S.C.P. (*Id.* ¶ 255.)

Once the interview and observation session was concluded, at approximately 11:45 a.m., Plaintiffs were told that a home inspection was "required." (*Id.* ¶¶ 256, 260.) Plaintiffs claim that it was protocol in all sexual abuse investigations to conduct a home inspection, regardless of

whether the report created reasonable cause to suspect abuse, and regardless of whether the investigation to that point had dispelled any suspicion of abuse. (*Id.* ¶ 257.) Scolza then handed Condoluci his business card with the County seal on it, identifying him as an "Investigator" for the Orange County Department of Social Services, but at no point during the investigation did he identify himself as a police officer. (*Id.* ¶¶ 258-59.) The home inspection was scheduled for the following day, November 6, 2009, at 2:00 p.m. (*Id.* ¶ 260.) Plaintiffs claim that they feared that if they did not consent to the home inspection, Scali-Decker and Scolza would attempt to remove the children from their home, or would attempt to interview T.C.P. without their authorization again. (*Id.* ¶¶ 261-62.)

Immediately after their meeting with CPS, the Parent Plaintiffs went to Scotchtown Avenue Elementary School, where they met with Melissa Lawson, the school's vice-principal, and Jankowski. (*Id.* ¶¶ 263-64.) The Parent Plaintiffs complained to Lawson and Jankowski that the school had not contacted them regarding T.C.P.'s questioning, to which Lawson responded that it was school policy to let CPS decide whether or not parents are notified, and that the school's responsibilities were limited to checking identification and ensuring that a school employee is present during the questioning of any child. (*Id.* ¶¶ 265-66.) Lawson also stated that Plaintiffs could place a letter in T.C.P.'s file indicating that T.C.P. was not to be spoken to by anyone other than school personnel without a parent's prior written consent. (*Id.* ¶ 267.) Plaintiff Condoluci sent such a letter to be filed at T.C.P.'s school the following day, and Daria Murphy, the school's principal, acknowledged receipt of the letter and told Condoluci that the school would comply with her request. (*Id.* ¶¶ 268-70.)

On November 6, 2009, at 2:30 p.m., Joe LaSusa, a senior CPS caseworker, arrived at

Plaintiffs' home to conduct the home inspection.[11]  (*Id.* ¶ 271.)  LaSusa observed Phillips and

Condoluci interacting with R.S.C.P. and walked around the downstairs of the house.  (*Id.* ¶¶ 273-

74.)  He would not divulge Hogle's name as the person who made the call to the SCR, only

stating that the report had come from a "mandated reporter."  (*Id.* ¶ 276.)  Condoluci inquired

about the questions that had been asked of T.C.P. during the in school interview, and LaSusa

would not give her any details, stating only that T.C.P. gave good answers to the questions and

that there was a "whole series of questions" routinely asked by caseworkers investigating abuse.

(*Id.* ¶¶ 277-78.)  Phillips told LaSusa that he had previously had a discussion with "friends"

about art, and where he mentioned that many people regard Anne Geddes' naked pictures of

babies as "art."  (Id. ¶ 280.)  In response, LaSusa warned Phillips to be more careful, stating that

there are many "small-minded" people in Orange County.  (Id. ¶ 281.)  LaSusa repeated that it

was CPS policy to question children in school without parental authorization, regardless of the

nature of the allegations.  (*Id.* ¶ 282.)  LaSusa insisted on seeing the bedrooms in the house —

stating, "with allegations like these, I need to see the bedrooms" — and had Plaintiffs explain the

family's sleeping arrangements.  (*Id.* ¶¶ 283-84, 286-90.)  Plaintiffs again claim that they feared

that their children would be removed or seized if they did not comply by showing LaSusa the

bedrooms and answering his questions about their sleeping arrangements.  (*Id.* ¶ 285.)  Plaintiffs

informed LaSusa that a note had been placed in T.C.P.'s school that she was not to be questioned

at school again, and LaSusa stated that he would pass the information on to Scali-Decker.  (Id. ¶¶

291-92.)

On November 9, 2009, Scali-Decker and Smith held a case conference, and they

determined that the case should be closed as "unfounded," and Scali-Decker informed Scolza

_____

[11] LaSusa is not named as a Defendant in this action.

that the case would be closed.  (*Id.* ¶¶ 296-97.)  On November 13, 2009, the report was officially deemed unfounded, and the case was administratively closed by the County.  (*Id.* ¶ 298.)  Even after the case was closed, Hogle still refused to have her name revealed to Phillips or Condoluci. (*Id.* ¶ 299.)  On November 9, 2009, Condoluci delivered a letter to Scali-Decker and Scolza, explaining the impact the investigation had on their family, and requesting that the case be referred to the District Attorney's office for prosecution of the mandated reporter's source of information under New York Penal Law § 240.50(4).  (*Id.* ¶ 300.)[12]  Scali-Decker told Condoluci to direct all questions about criminal matters to the District Attorney's office or to Scolza.  (*Id.* ¶ 301.)  Upon reviewing the case, the District Attorney's office determined that no charges could be brought against Falletta under N.Y. Penal Law § 240.50(4), because Hogle was in fact not a mandated reporter under N.Y. Social Services Law § 413.  (*Id.* ¶¶ 302-03.)  Plaintiffs allege that this was the first time that Scali-Decker, Smith, Scolza, and LaSusa became aware that Hogle was not a mandated reporter.  (*Id.* ¶ 305.)

Plaintiffs claim that the CPS investigation had deep, long-lasting, and devastating effects on the family, and that it "drove a wedge into the family that eroded the family's solidarity internally and impaired the family's ability to function as a unit."  (*Id.* ¶¶ 306-07.)  Because of T.C.P.'s young age, the Parent Plaintiffs were not able to talk with her openly about the questioning, which caused them to feel "emotionally distant" from their daughter.  (*Id.* ¶ 308.) The Parent Plaintiffs were unable to sleep regularly or eat for a period of time following the investigation.  (*Id.* ¶ 310.)  Condoluci often became nauseous upon thinking of her daughter

---

[12] New York Penal Law § 240.50(4) provides that a person is guilty of falsely reporting an incident of child abuse in the third degree when the person knows that the information reported is false or baseless, and reports the information to the SCR, or to a mandated reporter, knowing that the person is required to report cases of suspected abuse.  (TAC ¶ 30.)

being questioned about intimate details of her life at school, and the Parent Plaintiffs would often "burst into tears and cr[y] for hours after their children went to sleep." (*Id.* ¶¶ 311-12.) Phillips started only running errands late in the evening, not wanting to see people because he felt as though people were looking at him as a pedophile. (*Id.* ¶ 313.) The Parent Plaintiffs removed T.C.P. from the School District and are sending her to a private school to ensure her safety and well being, as well as the protection of their constitutional rights. (*Id.* ¶ 316.) Further, the Parent Plaintiffs claim that their interactions with their children became guarded for about six months, for fear of misinterpretation by others. (*Id.* ¶ 318.) Condoluci claims that she still feels nauseous when thinking about the "totally unwarranted invasion of her family's constitutional rights because none of the defendants knew what 'reasonable cause to suspect abuse meant' nor did they know the definition of a mandated reporter." (*Id.* ¶ 315 (emphasis omitted).)

B. Procedural History

Plaintiffs filed their initial Complaint, against the County of Orange and the Goshen Central School District Board of Education, on January 13, 2010. (Dkt. No. 1.) Upon leave of the Court, Plaintiffs filed their First Amended Complaint on March 24, 2010, adding the Individual Defendants, in their individual and official capacities, causes of action claiming violations of procedural and substantive due process, and a Fourth Amendment claim. (Dkt. No. 16.) Plaintiffs filed their Second Amended Complaint, once again upon leave of the Court, on May 7, 2010, adding the Village of Goshen as a Defendant. (Dkt. No. 23.) Defendants filed motions to dismiss on June 9, 2010, and June 10, 2010. (Dkt. Nos. 26, 28, 33.) While the motions were pending, on October 12, 2010 the Supreme Court granted certiorari in *Camreta v. Greene*, 131 S. Ct. 456 (2010), which addressed some of the legal issues of this case, and held oral argument in the case on March 1, 2011. On the same day, the Court issued an Order

17

denying Defendants' motions without prejudice, citing the potential impact of the Supreme

Court's decision in *Greene* on this case. (Dkt. No. 44.) Subsequently, the Supreme Court held

that the issue presented in *Greene* was moot, and vacated the portion of the Ninth Circuit's

decision holding that in-school interviews of children in the absence of probable cause or

parental consent violated the Fourth Amendment. *Camreta v. Greene*, 131 S. Ct. 2020, 2035-36

(2011). The Court then granted Plaintiffs leave to file a Third Amended Complaint (Dkt. No.

49), which Plaintiffs filed on June 17, 2011, (Dkt. No. 51). The Village Defendants and the

School District Defendants filed their motions to dismiss on September 2, 2011. (Dkt. Nos. 57,

60.) The County Defendants filed their motion to dismiss on September 6, 2011. (Dkt. No. 65.)

The Court held oral argument on May 4, 2012.

## II. Discussion

### A. Standard of Review

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's

factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez

v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Ruotolo v. City of New York*,

514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint

pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all

reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)). "In

adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated

on the face of the complaint, in documents appended to the complaint or incorporated in the

complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v.

Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal citations omitted). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. If a plaintiff "ha[s] not nudged [his/her] claims across the line from conceivable to plausible, [his/her] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (alteration in original) (internal citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

B. Analysis

Plaintiffs allege that all Defendants violated their rights under the Fourth and Fourteenth Amendments of the Constitution, and that the County of Orange, Village of Goshen, and Goshen Central School District engaged in a conspiracy to violate Plaintiffs' Fourth and Fourteenth Amendment rights. They seek to hold Defendants liable pursuant to 42 U.S.C. § 1983. In Plaintiffs' first cause of action, they allege that all Defendants violated T.C.P.'s Fourth Amendment right to be free from unreasonable seizures when she was interviewed at school. (*Id.* ¶¶ 368-84.) In their second cause of action, Plaintiffs allege that all Defendants violated

T.C.P.'s, Phillips', and Condoluci's Fourth Amendment right to be free from unreasonable searches through their interview of T.C.P. (*Id.* ¶¶ 385-96.) Plaintiffs' third cause of action is brought against the Village Defendants and County Defendants and alleges that the interview of the Parent Plaintiffs at CPS was an unreasonable search in violation of their Fourth Amendment rights. (*Id.* ¶¶ 397-409.) In the fourth cause of action, brought against the County of Orange, the Parent Plaintiffs allege that the home visit by LaSusa constituted an unreasonable search in violation of the Fourth Amendment. (*Id.* ¶¶ 410-20.) Plaintiffs' fifth cause of action alleges that all Defendants violated the Parent Plaintiffs' procedural due process rights under the Fourteenth Amendment by interviewing T.C.P. without their consent or a court order, and in the absence of emergency circumstances. (*Id.* ¶¶ 421-26.) In Plaintiffs' sixth cause of action, they allege that all Defendants violated T.C.P.'s, Phillips', and Condoluci's substantive due process rights under the Fourteenth Amendment based on the interview of T.C.P. (*Id.* ¶¶ 427-31.) In their seventh cause of action, Plaintiffs allege that the Village Defendants and County Defendants violated the Parent Plaintiffs' substantive due process rights based upon the interview at CPS and the observation of R.S.C.P. (*Id.* ¶¶ 432-35.) In Plaintiffs' eighth cause of action, they claim that the County of Orange violated the Parent Plaintiffs' substantive due process rights during the home visits by LaSusa. (*Id.* ¶¶ 436-39.) Finally, in their ninth cause of action, Plaintiffs claim that the Village of Goshen, the County of Orange, and the Goshen Central School District engaged in a conspiracy to violate their Fourth and Fourteenth Amendment rights based on the interview of T.C.P. (Id. ¶¶ 440-48.)

1.  Fourth Amendment

a.  T.C.P.'s in-school interview

i. Seizure Claim

Plaintiffs claim that Defendants' interview of T.C.P. at her school violated her Fourth Amendment right to be free from unreasonable searches and seizures.[13]  Plaintiffs argue that the interview of T.C.P. was a "seizure" by Jankowski, Scali-Decker, and Scolza, and that such seizure was not justified because there was no "reasonable cause" to suspect abuse at the time T.C.P. was seized.  (TAC ¶¶ 377, 380.)  "[T]he Fourth Amendment applies in the context of the seizure of a child by a government agency official during a civil child-abuse or maltreatment investigation."  *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000).  The threshold question, therefore, is whether the in-school interview of T.C.P. constituted a "seizure" for Fourth Amendment purposes.  *See Kyllo v. United States*, 533 U.S. 27, 31 (2001) (noting that "the antecedent question" in a Fourth Amendment inquiry is whether the governmental conduct in question constituted a search or seizure).  Only if the action continued a "seizure" does the Court then analyze whether the seizure was reasonable under the Fourth Amendment.  *See Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005) (ending the Fourth Amendment inquiry after determining that the contested police action did not constitute a search).

Not every encounter between a private citizen and government officials constitutes a seizure, and the relevant assessment is of the "overall coercive effect of police [or state official] conduct."  *Dejesus v. Vill. of Pelham Manor*, 282 F. Supp. 2d 162, 168 (S.D.N.Y. 2003) (alteration in original) (internal quotation marks omitted).  "A 'seizure,' triggering the Fourth

---

[13] The provisions of the Fourth Amendment are applicable to Defendants through the Due Process Clause of the Fourteenth Amendment.  *See Mapp v. Ohio*, 367 U.S. 643 (1961).

Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (second alteration in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Further, a seizure occurs where, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Kia P.*, 235 F.3d at 762 (internal quotation marks omitted). "Factors that have been found relevant in determining whether a seizure has occurred include: 'threatening presence of several officers; the display of a weapon; physical touching of the person [by] the officer; language or tone indicating that compliance with [the] officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by an officer to accompany him to the police station or a police room.'" *Dejesus*, 282 F. Supp. 2d at 169 (quoting *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990)). Courts should also consider the age of the person being questioned because "'whether the person being questioned is a child or an adult" is "relevant" to whether a person would feel free to leave. *United States v. Little*, 18 F.3d 1499, 1505 n.6 (10th Cir. 1994); *see also Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005) (noting that plaintiff's "encounter" with police officers should be viewed "through the eyes of a reasonable sixteen-year-old").

Defendants first argue that T.C.P. was never "seized" during the course of the in-school interview, noting that the Second Circuit has never held that such an interview constitutes a violation of the Fourth Amendment, and citing *Williams v. Jurow*, No. 05-CV-6949, 2007 WL 5463418 (S.D.N.Y. June 29, 2007), which found no Fourth Amendment violation where a doctor examined a child in a hospital setting following a court order, because no removal of custody occurred. (Village Defs.' Mem. of Law in Supp. of their Mot. to Dismiss ("Village Defs.'

Mem.") 11; Sch. Dist. Defs.' Mem. of Law in Further Supp. of their Mot. to Dismiss ("Sch. Dist. Defs.' Mem.") 9; Cnty. Defs.' Mem of Law ("Cnty. Defs.' Mem.") 17.)  Defendants heavily rely on the *Jurow* court's statement that "because plaintiff does not allege that [her son] was removed from her control, there can be no Fourth Amendment violation."  2007 WL 5463418, at *15, *adopted in relevant part by* 2008 WL 4054421 (S.D.N.Y. Aug. 28, 2008).  However, taken in the context of that case, this statement simply meant that the plaintiff stated no seizure for Fourth Amendment purposes in that case, not that a removal from custody is a prerequisite for a child abuse investigation to result in a violation of the child's Fourth Amendment rights.[14]

Lower courts within the Second Circuit have held that a deprivation of custody constitutes a seizure under the Fourth Amendment.  *See Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 375-76 (E.D.N.Y. 2011) (finding that there was an issue of fact as to whether parents were free to take their child from hospital, and thus allowing Fourth Amendment seizure claim to go forward); *E.D. ex rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 366 (S.D.N.Y. 2010) ("The removal of a child, even on a temporary basis, may constitute a 'seizure' for the purpose of the Fourth Amendment's prohibition against unlawful search and seizure."), *aff'd*, 408 F. App'x 448 (2d Cir. 2011).  However, the Court has been unable to locate any precedent within the Second Circuit addressing whether an in-school interview of a child by CPS workers

---

[14] In *Jurow*, the medical examinations were court ordered and the plaintiff brought her son to the doctor.  Thus, because there was a court order and consent to the medical examinations, the court did not construe her complaint as stating that the medical examinations themselves were seizures.  However, several family court orders had transferred custody of the plaintiff's son to the Administration of Child Services, though she retained physical custody of him throughout the entire investigation.  2007 WL 5463418, at *6-7.  Therefore, the court seems to have construed the plaintiff's Fourth Amendment claim as alleging that the family court orders were "seizures" in violation of the plaintiff's son's Fourth Amendment rights, and because there was no deprivation of custody and he was not "seized" in any way, she failed to state a claim.

constitutes a seizure, such that the child can state a valid Fourth Amendment claim.[15] Therefore, the Court will analyze Plaintiffs' allegations about the questioning to determine whether in fact T.C.P. could have felt free to leave and decline to answer the questions posed by Scali-Decker and Scolza.

Defendants contend that they committed no coercive acts as to T.C.P. during the course of her interview, and that thus she was never "seized." (Cnty. Defs.' Mem. 16-17.) Plaintiffs, on the other hand, claim that T.C.P., a five-year-old child, could not have felt free to leave the Assistant Principal's office after being escorted there for questioning by three adults, especially where the door was shut, and she was told that she had to answer the questions. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem.") 29-30.) In further support of this point, Plaintiffs rely on *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), which involved an in-school interview of a child by child protective services caseworkers and a law enforcement officer. In concluding that the interview constituted a seizure of the child under the Fourth Amendment, the *Heck* court noted that where a child is escorted by a school official to a room and interviewed by caseworkers, with a uniformed police officer present, for twenty minutes, "no reasonable child would have believed that he was free to leave [the interview]." *Heck*, 327 F.3d at 510.[16]

---

[15] However, one district court in the Second Circuit has held that an in-school interview of a student suspected of violating school policies constitutes a seizure under the Fourth Amendment. *See Mislin v. City of Tonawanda Sch. Dist.*, No. 02-CV-273S, 2007 WL 952048, at *8-9 (W.D.N.Y. Mar. 29, 2007) (noting that the Second Circuit has not addressed "whether the Fourth Amendment applies to the *seizure* of a student by school officials," but holding that student "was seized for purposes of the Fourth Amendment when . . . he was removed from his class during the school day and required to sit for a 20-minute, closed-door, recorded interview with [an investigating attorney]" and applying the modified reasonableness standard in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985)).

[16] Although *Heck* involved the questioning of a child at a private school, the Seventh Circuit did not consider this factor in its analysis of whether the student's questioning constituted a seizure. 327 F.3d at 510. Therefore, the court's seizure analysis should apply equally in the

The Seventh Circuit is not alone in this view. Several other circuits have held that an in-school interview a child for the purpose of investigating the student's conduct constitutes a seizure under the Fourth Amendment. In *Stoot v. City of Everett*, the Ninth Circuit relied on *Heck* to hold that an in-school interview of a fourteen-year-old suspected of committing child abuse constituted a seizure under the Fourth Amendment. 582 F.3d 910, 918 (9th Cir. 2009). Similarly, the Third Circuit has held that a student was seized where he was removed from class and detained in the school's administrative offices for several hours following his questioning by the assistant principal to investigate allegations that he improperly touched a female student. *See Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146-47 (3d Cir. 2005). The Fourth Circuit also has held that the in-school questioning of a student constitutes a seizure under the Fourth Amendment. *See Wofford v. Evans*, 390 F.3d 318, 325 (4th Cir. 2004) (holding that student who was held in the principal's office for questioning based on a suspected disciplinary violation was seized for Fourth Amendment analysis).[17] In a slightly different context, the Tenth Circuit has held that a student who was confronted in school by a state social worker and a police officer, who demanded that she leave her mother's care to reside with her

---

public school context. *See Lane v. Milwaukee Cnty. Dep't of Soc. Servs.*, No. 10-CV-297, 2011 WL 5122615, at *5 (E.D.Wis. Oct. 28, 2011) (relying on *Heck* to find that interview of student in public school was a seizure). However, the *Heck* court's analysis of the reasonableness of the seizure relied heavily on the fact that the student was questioned on private property, and thus *Heck's* holding that the defendants' warrantless seizure of the student was presumptively unreasonable absent an exception to the warrant requirement or exigent circumstances does not necessarily apply to the public school context. *Heck*, 327 F.3d at 513-15; *see also Lane*, 2011 WL 5122615, at *5 (noting that where a seizure occurs in a public school, courts in the Seventh Circuit continue to apply the more "lenient" standard of scrutiny from *Daryl H. v. Coler*, 801 F.2d 893 (7th Cir.1986), to assess the reasonableness of the seizure, in which courts consider "the need of a particular search against the invasion of personal rights that the search entails" (internal quotation marks omitted)).

[17] And, as previously noted, at least one district court within the Second Circuit has reached a similar conclusion. *See Mislin*, 2007 WL 952048, at *8-9.

father, was seized during the encounter. *See Jones*, 410 F.3d at 1226-27. And, there are numerous other lower courts which have held or assumed that an in-school interview of a child to investigate allegations of parental abuse can constitute a seizure under the Fourth Amendment. *See, e.g.*, *Lane v. Milwaukee Cnty. Dep't of Soc. Servs.*, No. 10-CV-297, 2011 WL 5122615, at *5 (E.D.Wis. Oct. 28, 2011) (assuming that in-school interview of child in public school — to investigate allegations that child was abused by the parents — was seizure for Fourth Amendment purposes); *Loftus v. Clark-Moore*, No. 09-CV-14019, 2009 WL 1956319, at *3 (S.D. Fla. July 07, 2009) (concluding that "viewing the available facts in a light most favorable to the Plaintiffs, [the] Court cannot find as a matter of law at this stage that there are no circumstances consistent with the facts as pled that constitute an unreasonable seizure [of the child during in-school interview by caseworkers investigating her family] in violation of the Fourth Amendment"); *cf. Word of Faith Fellowship, Inc. v. Rutherford Cnty. Dep't of Social Servs.*, 329 F. Supp. 2d 675, 687 (W.D.N.C. 2004) (holding that questioning of child in DSS vehicle outside of child's private school without parental consent constituted a Fourth Amendment seizure). *But see Picarella v. Terrizzi*, 893 F. Supp. 1292, 1301 (M.D. Pa.1995) (holding that in-school questioning of student by administrators when there is "reason to believe" that child has been abused is not per se Fourth Amendment violation, and that no constitutional violation occurred in that case). And, as noted, at least one court has stressed the need to look at the totality of the circumstances to determine whether the interview of the child constituted a seizure. *See Jones*, 410 F.3d at 1226 (noting the importance of considering the "totality of the circumstances," taking into account the degree of coercion used by the officers as

well as the interviewee's age).[18]

Examining the circumstances surrounding T.C.P.'s interview, Plaintiffs have alleged sufficient facts to state a plausible claim that T.C.P. was seized during her in-school interview. Even though the Third Amended Complaint does not make clear whether Scolza was in uniform at the time of the interview, Plaintiffs have alleged that T.C.P. was removed from her class by a school administrator, taken to a room with three adults with the door closed, told that she "had to" answer their questions, and that the examination was "like a test." (TAC ¶¶ 135, 142-144.) Plaintiffs further allege that at no time did any of T.C.P.'s interviewers offer to call her parents, or let her know that she was free to decline their questioning. (*Id.* ¶¶ 145-46.) Under these circumstances, a reasonable five-year-old child would not have thought she was free to leave or decline the adults' questioning. Therefore, Plaintiffs have stated a claim that T.C.P. was "seized" within the meaning of the Fourth Amendment. *See Jones*, 410 F.3d at 1227 (noting that "[a] reasonable high school student would not have felt free to flaunt a school official's command, leave an office to which she had been sent, and wander the halls of her high school without permission"); *Heck*, 327 F.3d at 510 (finding that where eleven-year-old boy was removed from his class and questioned by a police officer and two caseworkers "for twenty minutes about intimate details of his family life," he was "'seized' within the meaning of the Fourth Amendment because no reasonable child would have believed that he was free to leave").

Having made the threshold determination that the interview of T.C.P. was a seizure, the

_____

[18] The *Jones* court also noted that "[t]he relaxed [reasonable suspicion] standard announced in [*New Jersey v.*] *T.L.O.* [which the court generally applies to determine whether the in-school seizure of a child is reasonable]. . . . is irrelevant to determining if a seizure occurred, and applies only to an inquiry into the reasonableness of a search or seizure." *Jones*, 410 F.3d at 1228 n.3.

Court next examines whether Plaintiffs have adequately alleged that the seizure was unreasonable, and thus in violation of the Fourth Amendment. *See Heck*, 327 F.3d at 510 ("Having concluded that the defendants . . . seized John Doe, Jr., we must now 'evaluate the search or seizure under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" (quoting *Wyoming v. Houghton*, 526 U.S. 295, 299-300 (1999)).[19] The Second Circuit has not yet determined what

---

[19] Plaintiffs did not give their consent to the interview of T.C.P., which distinguishes this case from *Durven D. v. Giuliani*, No. 98-CV-0523, 2000 WL 1145425, at *5 (S.D.N.Y. Aug. 11, 2000), where the court found no Fourth Amendment violation from the in-school interview partly because the child's father had given consent to have the child interviewed in school. Consent operates as an exception to the Fourth Amendment's warrant or probable cause requirement. *See Florida v. Royer*, 460 U.S. 491, 502 (1983) (noting that when an encounter with the police is consensual, a person is not "seized" within the meaning of the Fourth Amendment); *cf. Southerland v. City of New York*, 680 F.3d 127, 160 (2d Cir. 2012) (noting that removing a child from his home without parental consent, exigent circumstances, or a court order constituted a "seizure" under the Fourth Amendment). Courts also have held that when a private school consents to a caseworker's interview of a child, the child cannot claim that the interview constituted an improper seizure under the Fourth Amendment. *See Michael C. v. Gresbach*, 526 F.3d 1008, 1015 (7th Cir. 2008) (analyzing whether private school principal's consent to interview children at school (which was not challenged as invalid) extended to consent to search their bodies); *Jefferson v. Cnty. of Napa*, No. 03-CV-5031, 2007 WL 4410412, at *6 (N.D. Cal. Dec. 14, 2007) (finding no Fourth Amendment violation when private school authorities consented to the interview of the student). However, there is a critical difference between public and private schools in that "when parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995). Therefore, the consent of a private school teacher or administrator can operate as parental consent. But, "the Supreme Court has rejected the notion that public schools generally 'act *in loco parentis* in their dealings with students: [that] their authority is that of the parent . . . . Such reasoning is in tension with contemporary reality and the teachings of th[e] Court.'" *Tenenbaum v. Williams*, 193 F.3d 581, 594 n.9 (2d Cir. 1999) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 336 (1985)). Indeed, the Second Circuit has been clear that "[t]he handing over of a child from a public school teacher to another State official . . . is not the equivalent of the consent of the parents." *Id.*

standard applies in the context of child abuse investigations to determine whether the seizure of a child is reasonable. *See Estiverne*, 833 F. Supp. 2d at 376 ("The Second Circuit has yet to decide definitively the appropriate standard by which to assess the reasonableness of a seizure in the context of a child abuse investigation."). This inquiry is further complicated by the fact that the Second Circuit cases addressing the reasonableness of a child's seizure have all involved situations where the child was physically removed either from the school or from the parents' custody, and thus have not addressed what standard should apply where the seizure did not result in a deprivation of custody. In *Tenenbaum v. Williams*, 193 F.3d 581, 603 (2d Cir. 1999), where the child was taken from school and brought to a hospital for a medical examination, the Court applied the "probable cause" standard, noting that the term "probable cause" is generally descriptive of what seizures are reasonable where no warrant (or in the abuse investigation context, a court order) has been obtained. *Id.* at 603. However, *Tenenbaum* left open the possibility that in certain circumstances, the "less stringent reasonableness requirement" could apply where, for example, the law of probable cause and the warrant established in the criminal setting would impose intolerable burdens or make a child abuse investigation impracticable. *Id.* at 603-04.[20] The *Tenenbaum* Court thus declined to decide, for example, "whether case workers ever have 'special needs' that would permit them to base a removal of a child on information

_____

[20] In *New Jersey v. T.L.O.*, the Supreme Court determined that school administrators conducting in-school searches of students were not required to meet the requirements of probable cause, holding that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." 469 U.S. 325, 341 (1985). To determine reasonableness, the search must be supported by reasonable suspicion and must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The Supreme Court further instructed that "the requirement of reasonable suspicion is not a requirement of absolute certainty: sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Id.* at 346 (internal quotation marks omitted).

from an anonymous source contrary to ordinary probable cause jurisprudence." *Id.* at 604 n.15. The *Tenenbaum* Court also explicitly noted that the "exigent circumstances" exception to the warrant requirement could apply in child abuse investigations, and thus a child may be removed from school absent al consent or a court order "where information possessed by a state officer would warrant a person of reasonable caution in the belief that a child is subject to the danger of abuse if not removed from school before court authorization can reasonably be obtained." *Id.* at 605. Likewise in *Kia P.*, the Second Circuit declined to decide which standard for determining whether a seizure was "reasonable" should apply in cases where the state seizes a child in order to prevent abuse or neglect. 235 F.3d at 762 (declining to address whether the seizure "requires probable cause, or whether it is subject to a less stringent reasonableness requirement due to the special needs of child protection agencies, or whether [it] must be justified by exigent circumstances" (internal quotation marks omitted)); *see also Nicholson v. Scoppetta*, 344 F.3d 154, 173 (2d Cir. 2003) (declining to address "the question whether in the context of the seizure of a child by a state protective agency the Fourth Amendment might impose any additional restrictions above and beyond those that apply to ordinary arrests").[21] The Parties have not cited, nor has the Court found, any district court decisions in the Second Circuit which have explicitly applied the less stringent "reasonableness" analysis in the context of the seizure of a child suspected of abuse without a court order or consent. *See, e.g.*, *Estiverne*, 833 F. Supp. 2d at 375-76 (noting that the Second Circuit has yet to decide definitively the standard by which to assess the reasonableness of a seizure in the context of a child abuse investigation, and deciding that an

---

[21] Complicating the inquiry is the fact that the cases previously cited involve physical removal of the child from custody; the Court has found no analogous cases from within the Second Circuit where a child claimed a Fourth Amendment seizure from merely being questioned without parental consent or court order, but without removal of the child from custody.

issue of fact as to reasonableness would exist regardless of whether "probable cause" or the more lenient "reasonable person" standard would apply); *Renaud v. Mattingly*, No. 09-CV-9303, 2010 WL 3291576, at *8 (S.D.N.Y. Aug. 10, 2010) (holding that there was probable cause to remove the children); *Pezzenti v. Capaldo*, No. 03-CV-419, 2004 WL 2377241, at *4-5 (D. Conn. Sept. 23, 2004) (finding that probable cause supported removal of child without a court order); *Hollenbeck v. Boivert*, 330 F. Supp. 2d 324, 334 (S.D.N.Y. 2004) (denying motion to dismiss where plaintiffs sufficiently alleged that ACS lacked probable cause to remove the children from their custody and alleged that no exigent circumstances existed to warrant removal).[22]

Regardless of whether the traditional "probable cause" standard or a "less stringent

---

[22] Courts in the Second Circuit have noted that "[i]n cases involving seizures short of traditional arrest the courts should be guided by 'the ultimate standard of reasonableness embodied in the Fourth Amendment.'" *Graham v. City of New York*, No. 08-CV-3518, 2011 WL 3625074, at *5 (E.D.N.Y. Aug. 17, 2011) (quoting *Michigan v. Summers*, 452 U.S. 692, 699-700 (1981)). In *Graham*, a father was arrested and his son was temporarily seized based on the father's arrest. There, the court applied a general "reasonableness" standard, which "requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Id.* at *6 (internal quotation marks omitted). Likewise, in *Mislin*, the district court applied the reasonableness standard articulated in *T.L.O.* to determine the reasonableness of a student's in-school seizure where the student was interviewed to assess whether he had racially harassed another student. 2007 WL 952048, at *8-10.

Other circuits also have adopted modified reasonableness standards for child abuse investigations. The Tenth Circuit has held that "[w]here a social worker merely conduct[s] an interview of a child at a public school, and thus d[oes] not remove the child nor interfere with the sanctity of the private home," the "reasonable suspicion" standard of *Terry v. Ohio* applies. *Jones*, 410 F.3d at 1228 n.4 (citing *Doe*, 41 F.3d at 575 n. 3). The Seventh Circuit also has adopted a reasonableness test, which it applies to searches and seizures in public schools, where courts "evaluate whether, under the circumstances of a particular case, the government officials in question had 'some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.'" *Heck*, 327 F.3d at 515 (quoting *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1019 (7th Cir. 2000)); *see also Darryl H. v. Coler*, 801 F.2d 893, 901-03 (7th Cir. 1986) (holding that investigative searches performed pursuant to child abuse investigations need not meet the probable cause and warrant requirements, but instead must comply with a more general reasonableness requirement).

reasonableness requirement" applies, Plaintiffs have pled sufficient facts to state a claim that T.C.P.'s Fourth Amendment rights were violated. Plaintiffs have adequately pled that Defendants lacked probable cause or reasonable suspicion to suspect abuse at the time TCP was interviewed. Plaintiffs first allege that Hogle's report, although it lacked sufficient facts to create a reasonable suspicion of abuse, was passed on to CPS and acted upon because N.Y. Social Services Law § 422(2)(b) provides that certain calls from mandated reporters "shall constitute a report" of abuse and are to be transmitted for investigation. (TAC ¶¶ 17, 70.) Although Hogle called the phone number specifically reserved for mandated reporters, Plaintiffs allege that the contents of her call should have alerted Defendants that she was not making the call as a mandated reporter. She had no firsthand knowledge of the suspected abuse and alleged no interaction with Plaintiffs in her professional capacity — requirements for a mandated reporter — and she related information from an anonymous source whom she refused to reveal. (*Id.* ¶¶ 18, 61-69, 95-109.) Plaintiffs allege that the contents of Hogle's call alone were not sufficient to create probable cause or reasonable suspicion of abuse, let alone any bona fide concern that T.C.P. was in immediate danger. Furthermore, according to Plaintiffs, Defendants' own policies also reveal that they did not consider whether the call created probable cause or reasonable suspicion before interviewing T.C.P., as Plaintiffs allege that the County and Village have a policy of immediately interviewing children — without consent or a court order — when a report is made of suspected sexual abuse, regardless of whether the report created reasonable cause to suspect abuse. (*Id.* ¶ 125.) Plaintiffs also claim that the School District has a policy of allowing children to be interviewed by CPS without inquiring whether parental consent had been obtained, or whether the CPS workers had sufficient cause to believe the child was abused. (*Id.* ¶¶ 137-38, 140-41.)

Therefore, Plaintiffs have pled sufficient facts to plausibly raise an issue as to whether probable cause existed to believe that T.C.P. was abused, or whether it was reasonable for Defendants to believe she had been abused under the circumstances.

## ii. Search Claim

Plaintiffs allege in their second cause of action that T.C.P.'s in-school interview constituted a search which violated T.C.P.'s, Phillips', and Condoluci's Fourth Amendment rights. (TAC ¶¶ 385-96.) Plaintiffs claim that they have a reasonable expectation of privacy in their home life, and that the "interrogation" of T.C.P., which elicited intimate details regarding their home life, intruded on this expectation of privacy. (Pls.' Mem. 32-33.)

It is well settled in that "'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" *Tenenbaum*, 193 F.3d at 601 n.13 (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). Although parents can bring Fourth Amendment claims on behalf of their minor children, they do not have standing to assert Fourth Amendment claims on their own behalf based on a violation of their child's Fourth Amendment rights. *Id.* (noting that the district court held that the parents could not assert a Fourth Amendment claim in their own behalf based on the state's treatment of their daughter, an issue that was not challenged on appeal). Numerous courts, both in the Second Circuit and elsewhere, have held that parents cannot allege that their own Fourth Amendment rights were violated by an unlawful search or seizure of their child. *See, e.g.*, *Kia P.*, 235 F.3d at 758 ("[L]ike the parental plaintiffs in *Tenenbaum*, Kia P. do[es] not have — or at least no longer allege[s] — cognizable Fourth Amendment claims based on her [daughter's] . . . removal" (alterations in original)); *E.D.*, 692 F. Supp. 2d at 366 ("Fourth Amendment rights are personal rights that cannot be asserted vicariously, but may be brought on behalf of a child by a parent"); *Hollenbeck*, 330 F. Supp. 2d at 334 n.10 (same); *see also*

*Konstantelos v. Ploehn*, No. 09-CV-6476, 2011 WL 651435, at *9 & n.4 (C.D. Cal. Feb. 11, 2011) (dismissing pro se plaintiffs' Fourth Amendment claims arising out of in-school interview of their son because son was not a party to the action, and "Plaintiffs have not made clear how the alleged actions violated [their] Fourth Amendment rights"); *Holmes v. City of Flagstaff*, No. 09-CV-8156, 2010 WL 2889934, at *3 (D. Ariz. July 21, 2010) (dismissing Fourth Amendment claim based on in-school search of plaintiff's son because plaintiff did not allege that he personally was searched or seized); *Reguli v. Guffee*, No. 08-CV-0774, 2009 WL 425020, at *10 (M.D. Tenn. Feb. 19, 2009) (dismissing pro se plaintiff's Fourth Amendment claims based on the removal and interrogation of one of her children from her public school, because plaintiff's own rights were not violated), *aff'd*, 371 F. App'x 590 (6th Cir. 2010). These cases seem to foreclose the ability of Parent Plaintiffs to claim that the interview of T.C.P. violated their own right to be free from unreasonable searches. However, courts have reasoned that it is "at least theoretically possible for a parent to establish standing to bring a Fourth Amendment claim based on the search of a child, [though] the parent must 'allege her own distinct injuries' as a result of the [search] to demonstrate standing to bring such a claim." *Belinda K. v. Cnty. of Alameda*, No. 10-CV-5797, 2011 WL 2690356, at *7 (N.D. Cal. July 8, 2011) (quoting *J.B. v. Walsh Cnty.*, 127 F.3d 919, 928 (10th Cir. 1997)). Plaintiffs have alleged that the interview of T.C.P. violated their legitimate expectation of privacy in intimate, family matters, and thus have at least alleged a personal injury arising from the interview.[23]

The question remains, however, whether the interview of T.C.P. was in fact a "search" under the Fourth Amendment. "[A] a Fourth Amendment search occurs when the government

---

[23] However, as discussed below, because T.C.P.'s interview did not constitute a search for Fourth Amendment purposes, the Court does not need to address whether Plaintiffs have in fact stated a claim that their own Fourth Amendment rights were violated.

violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo*, 533 U.S. at 33. Furthermore, the Supreme Court has instructed that "[w]hen the Fourth Amendment was adopted, as now, to search meant [t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief." *Id.* at 33 n.1 (second alteration in original) (internal quotation marks omitted). This definition of "search" implies a physical inspection and does not suggest that the questioning of an individual should constitute a "search" as the term is understood in the Fourth Amendment context. Plaintiffs have provided no authority to support their claim that an interview can constitute a search.

The Court finds instructive that the cases that have addressed whether in-school interviews of children during child abuse investigations violate the Fourth Amendment have analyzed the children's Fourth Amendment claims in the context of illegal seizure, not illegal search. *See, e.g.*, *Stoot*, 582 F.3d at 918 (holding that in-school interview of student suspected of committing abuse was a seizure); *Jones*, 410 F.3d at 1226 (holding that in-school confrontation with student constituted a seizure); *Jefferson v. Cnty. of Napa*, No. 03-CV-5031, 2007 WL 4410412, at *3, *6 (N.D. Cal. Dec. 14, 2007) (finding that in-school interview was not a seizure because the school gave valid consent); *Word of Faith Fellowship*, 329 F. Supp. 2d at 687 (analyzing whether interviews of children conducted in CPS vehicles outside of their school constituted searches or seizures, and determining that they were seizures under the Fourth Amendment). *But see Lane*, 2011 WL 5122615, at *5 (assuming that interview of student at school was both a search and a seizure). In *Heck*, the Seventh Circuit determined that the in-school interview of the child constituted an unlawful seizure, and that the investigation conducted by caseworkers on private school grounds constituted an unreasonable search

involving the school's property. 327 F.3d at 513 (noting that because the school and the student had a reasonable expectation of privacy in the private school's premises, "the defendants' warrantless search of the school and seizure of the child are presumptively unreasonable").[24]

Here, Plaintiffs claim that the *contents* of the questions asked (and the responses elicited from T.C.P.) constituted a search and violated their reasonable expectation of privacy in intimate familiar matters. However, the Court has been unable to locate any authority, and Plaintiffs cited none, standing for the proposition that questioning itself constitutes a search under the Fourth Amendment, and in particular, that a person *not* questioned but only about whom questions were asked, has been "searched' by government officials. In contrast, Defendants cite to *INS v. Delgado* for the proposition that "questioning [by a government authority], by itself, is unlikely to result in a Fourth Amendment violation." 466 U.S. 210, 216 (1984). In *Delgado*, the Supreme Court did not even contemplate that government questioning could constitute a search, and instead analyzed the questioning in the context of whether it was a seizure. *Id*. at 216-17; *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) (reaffirming that "mere police questioning does not constitute a seizure" (internal quotation marks omitted)); *cf. United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) ("The full court holds that, because questions are neither searches nor seizures, police need not demonstrate justification for each inquiry."); *United States v. Hunter*, No. 07-CR-265, 2008 WL 2074076, at *3 (W.D.N.Y. May 14, 2008) (extrapolating from the holding in *Muehler* to find that "the asking of a question does not constitute a search").

---

[24] The illegal search claim in *Heck* was brought by the school, not by the student's parents. 327 F.3d at 509. The *Heck* court thus conducted the analysis of the student's reasonable expectation of privacy in the private school to determine the reasonableness of his seizure, not because of any search claim brought on his behalf or by his parents. *Id.* at 513 ("Because we conclude that . . . John Doe Jr. had a reasonable expectation of privacy in and within the school's premises, the defendants' warrantless . . . seizure of the child [is] presumptively unreasonable.").

Although Plaintiffs counter that these cases can be differentiated because they involved investigatory questioning of suspects by law enforcement (Pls.' Mem. 32 n.26), their arguments are unavailing, particularly given that Plaintiffs cannot point to *any* authority indicating that questioning alone can constitute a search (rather than a seizure) under the Fourth Amendment.[25] Therefore, Plaintiffs' second cause of action is dismissed.

### b. Interview of Phillips and Condoluci

In their third cause of action, the Parent Plaintiffs claim that Phillips' and Condoluci's Fourth Amendment right to be free from unreasonable searches was violated by their interview with Scali-Decker and Scolza. (Pls.' TAC ¶¶ 397-409.) Plaintiffs argue that the interview was a search because it "sought details of [Plaintiffs'] intimate home life — matters in which Condoluci and Phillips had a reasonable expectation of privacy." (*Id.* ¶ 398.) However, the Parent Plaintiffs' claim suffers from the same infirmities discussed above in relation to their claim that T.C.P.'s interview constituted a search. *See Lane*, 2011 WL 5122615, at *6 (noting that questioning of mother in relation to child abuse investigation was neither search nor seizure under the Fourth Amendment). Therefore, Plaintiffs' third cause of action is dismissed.

### c. Home Visit

In their fourth cause of action, Phillips and Condoluci claim that the home visit by LaSusa constituted an unlawful search in violation of their rights under the Fourth Amendment.

---

[25] Plaintiffs cite *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), in support of their position. (Pls.' Mem. 33.) In that case, a hospital tested patients' urine samples for drugs without their consent and shared this information with law enforcement. The Supreme Court held that this practice constituted an unreasonable search in violation of the Fourth Amendment. *Ferguson*, 532 U.S. at 86. *Ferguson* did not involve the questioning of any of the individuals, and is not properly analogized to the facts of this case.

(TAC ¶¶ 410-20.)[26]  Ordinarily, the Fourth Amendment requires that state officials obtain a warrant based on probable cause before conducting a home search.  *See Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) ("It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotation marks omitted).  However, it is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *see also Holeman v. City of New London*, 425 F.3d 184, 191 (2d Cir. 2005) ("One such exception [to the Fourth Amendment's protection against warrantless searches] is consent by a party whose property or person is to be searched."); *Durven D. v. Giuliani*, No. 98-CV-0523, 2000 WL 1145425, at *5 (S.D.N.Y. Aug. 11, 2000) (finding no Fourth Amendment violation where during course of child abuse investigation plaintiff consented to the entry of police officers into his apartment).  Here, the Parent Plaintiffs admit that they consented to the home inspection conducted by LaSusa on November 6, 2009, (TAC ¶¶ 256-62), but they claim that this consent was not voluntarily given because they were not advised that they could refuse consent, (*Id.* ¶ 412.)  Instead, the Parent Plaintiffs claim they were told that the home visit was required.  (Id. ¶¶ 256-57, 260, 412.)  Thus, the Parent Plaintiffs assert that they feared that if they did not allow the home inspection, their children might be questioned again or taken from them.  (*Id.* ¶¶ 261-62, 413-14.)  They therefore claim that they "fore[went] their and their child's privacy interest to protect the child from [] emotional trauma," (*id.* ¶ 415), and that they "agreed to the home visit as a mere acquiescence to Decker and Scolza's colorable authority to investigate," (*id.* ¶ 416).

"Consent [to a search] is voluntary when it is 'a product of that individual's free and

---

[26] Plaintiffs only name the County of Orange as a defendant in this cause of action.

unconstrained choice, rather than a mere acquiescence in a show of authority.'" *United States v. Reyes*, No. 11-CR-58, 2012 WL 363042, at \*6 (S.D.N.Y. Feb. 1, 2012) (quoting *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir.1995)); *see also Schneckloth*, 412 U.S. at 233 (explaining that consent is not voluntary if it is given as a result of duress, coercion, or "granted only in submission to a claim of lawful authority"). With regard to consent in the Fourth Amendment context, the Supreme Court has explained that:

> [T]he question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a "voluntary" consent — the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.

*Schneckloth*, 412 U.S. at 227; *see also United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) ("Voluntariness is a question of fact determined by a totality of all the circumstances." (internal quotation marks omitted)). As long as it is not coerced, the consent is valid, and "[t]herefore, knowledge of the right to refuse consent is not a requirement to a finding of voluntariness." *Garcia*, 56 F.3d at 422; *see also United States v. Drayton*, 536 U.S. 194, 206 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search."). Therefore, Plaintiffs' allegation that they were not told that they had the right to decline the home visit (TAC ¶ 412), is relevant to the analysis of voluntariness, but is not dispositive.

In the criminal context, some of the factors that bear upon the voluntariness of consent to a search include "whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained,

whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent." *U.S. v. Echevarria*, 692 F. Supp. 2d 322, 336-37 (S.D.N.Y. 2010); *see also Drayton*, 536 U.S. at 204 (holding that consent was voluntary where there "was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, [and no] authoritative tone of voice."); *Isiofia*, 370 F.3d at 232-34 (holding that consent was not voluntary where defendant was handcuffed to a table in his home for over thirty minutes, while " numerous law enforcement agents . . . extracted detailed personal and financial information from him," demanded his consent, yelled and used abusive language, and threatened him with jail and deportation); *United States v. 90-23 201 St.*, 775 F. Supp. 2d 545, 556 (E.D.N.Y. 2011) (noting that other factors relevant to coercion include the number of police officers, the time of day the search is conducted, and police persistence after the individual has refused consent).

Because the voluntariness inquiry is concerned with the coercive conduct of government officials, the relevant inquiry here is whether the *actions or words of Defendants* either implicitly or explicitly coerced the Parent Plaintiffs into consenting; subjective fears by the Parent Plaintiffs are not sufficient to vitiate otherwise valid consent. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness."); *Southerland v. Garcia*, 09-CV-2230, 2010 WL 5173711, at *7 (E.D.N.Y. Dec. 15, 2010) (finding that where police did nothing to coerce plaintiff, her subjective fear that she would lose her city transit job and pension if she did not consent to the search did not negate her consent), *aff'd*, 2012 WL 1764213, at *1 (May 18, 2012 2d Cir. 2012) (noting that consent is assessed on an objective basis, and plaintiff's subjective fears did not vitiate consent where officers did not otherwise engage in coercive conduct). The

Parent Plaintiffs have alleged that they subjectively feared that there would be repercussions if they did not consent to the home visit (TAC ¶¶ 413-16), but they have not alleged that Scolza or Scali-Decker told them that their children would be removed if they did not participate, and/or that they were threatened with criminal prosecution, detention, or any other punitive measures. Therefore, the fact that the Parent Plaintiffs subjectively feared certain repercussions if they did not give their consent, without more, is insufficient to demonstrate that their consent was not voluntary.

However, Plaintiffs also have alleged that Scali-Decker told them that the home visit was "required" as part of the investigation. (*Id.* ¶¶ 256, 412.) This allegation cuts against a finding of voluntariness because Plaintiffs' recounting of events suggests that Phillips and Condoluci were told that they had no choice but to allow the home inspection. Where state officials have "claimed official authority to conduct [a] search," an individual "should not be found to have consented" to the search, because he or she is merely acquiescing to a "show of authority." *United States v. Milligan*, No. 09-CR-246, 2011 WL 3930284, at *5 (D. Conn. May 4, 2011) (quoting *United States v. Vasquez*, 638 F.2d 507, 524 (2d Cir. 1980)) (holding that consent to search defendant's car was not voluntarily given where police told defendant that "the car had to be inventoried before it was towed"); *Tirreno v. Mott*, 453 F. Supp. 2d 562, 568 (D. Conn. 2006) (denying summary judgment for defendants in § 1983 unlawful search claim where plaintiffs contended that they "acquiesced [to the search of their home] after the police told them they had no alternative"); *see also Schneckloth*, 412 U.S. at 233 ("[I]f under all the circumstances it has appeared that the consent was not given voluntarily — that it was . . . granted only in submission to a claim of lawful authority — then we have found the consent invalid and the search unreasonable."); *cf. Bumper v. North Carolina*, 391 U.S. 543, 550 (1968) ("When a law

enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion — albeit colorably lawful coercion. Where there is coercion there cannot be consent."). Thus, for example, the Second Circuit has found that consent to search was not voluntary where, among other coercive acts, the agents allegedly "demanded" that the defendant give his consent. *Isiofia*, 370 F.3d at 232. Such a demand may undermine the voluntariness of any consent given by an individual. *Cf. Drayton*, 536 U.S. at 206 (holding that consent to search was voluntary where "[n]othing [the] [o]fficer [] said indicated a command to consent to the search," and he provided defendant "with no indication that he was required to consent to a search"). Therefore, because the Parent Plaintiffs have alleged that they were told that the search was required to be done, they have stated a plausible claim that the home inspection violated their Fourth Amendment right to be free of unreasonable searches. Defendants' motion to dismiss Plaintiffs' fourth cause of action is therefore denied.

## 2. Procedural Due Process

In their fifth cause of action, Phillips and Condoluci claim that the interview of T.C.P., orchestrated by Defendants without a court order, a warrant, or parental consent, deprived them of the care, custody and management of their child in violation of their procedural due process rights under the Fourteenth Amendment. (TAC ¶¶ 421-26.) Courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted); *see also Swarthout v. Cooke*, 131 S. Ct. 859, 861 (2011) (same). As a threshold matter, the Court must therefore determine whether the

interview of T.C.P. infringed on Phillips' and Condoluci's right to "care, custody and management" of T.C.P. such that they can argue that process was due to them before she was interviewed at school. *See Rodriguez v. McLoughlin*, 214 F.3d 328, 337 (2d Cir. 2000) (analyzing as a threshold matter in procedural due process claim whether plaintiffs had alleged a protected liberty interest).

"Choices about marriage, family life, and the upbringing of children are among associational rights [the Supreme] Court has long ranked as 'of basic importance in our society,'" and are protected by the Fourteenth Amendment against unwarranted intrusion by the government. *Tenenbaum*, 193 F.3d at 593 (quoting *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996)). Therefore, parents have a "constitutionally protected liberty interest in the care, custody, and management of their children." *Id.* Thus, as a general rule, "before parents may be deprived of the care, custody, or management of their children without their consent, due process — ordinarily a court proceeding resulting in an order permitting removal — must be accorded to them.'" *Southerland v. City of New York*, 680 F.3d 127, 149 (2d Cir. 2012) (quoting *Nicholson*, 344 F.3d at 171), *reh'g en banc denied*, 681 F.3d 122 (2d Cir. 2012); *see also Shapiro v. Kronfeld*, No. 00-CV-6286, 2004 WL 2698889, at *12 (S.D.N.Y. Nov. 24, 2004) (noting that "any interference with family integrity must be in accord with procedural and substantive due process guarantees"); *Cornigans v. Mark Country Day Sch.*, No. 03-CV-1414, 2006 WL 3950335, at *5 (E.D.N.Y. July 12, 2006) ([P]rocedural due process generally requires a hearing prior to depriving a parent of custody or a prompt post-deprivation hearing if the child is removed under emergency circumstances."), *adopted as modified by J.C. v. Mark Country Day Sch.*, No. 03-CV-1414, 2007 U.S. Dist. LEXIS 4716 (E.D.N.Y. Jan. 23, 2007) . On the other hand, the state has a "traditional and 'transcendent interest in protecting the welfare of

children.'" *Maryland v. Craig*, 497 U.S. 836, 855 (1990) (quoting *Ginsberg v. New York*, 390 U.S. 629, 640 (1968)); *see also New York v. Ferber*, 458 U.S. 747, 757 (1982)) (noting that the "prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance"). In light of the state's "profound interest in the welfare of the child," *Tenenbaum*, 193 F.3d at 593-94, the Second Circuit has "adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context," *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999).

The Second Circuit cases addressing procedural due process in the child abuse context typically have involved some physical removal of the child from the parents' custody, which clearly implicates a protected liberty interest, and thus the framework articulated by the Second Circuit contemplates the process due before or immediately after a physical removal. *See Southerland*, 680 F.3d at 149 (discussing process due when child is removed from parents' custody); *Nicholson*, 344 F.3d at 171 (analyzing whether removal of children whose mothers were abuse victims comported with procedural due process); *Kia P.*, 235 F.3d at 759-60 (determining whether parents' procedural due process rights were violated by hospital holding child for one day after medical clearance); *Tenenbaum*, 193 F.3d at 593-95 (analyzing process required before child could be removed from school and brought to hospital for medical examination).[27]

---

[27] Plaintiffs contend that *Tenenbaum* did not involve a removal from custody, and thus can stand for the proposition that parents' rights to the care and management of their child can be violated without custodial interruption. (Pls.' Mem. 17-18.) However, in *Tenenbaum*, the child was physically removed from school, and in its procedural due process analysis, the Second Circuit noted this removal and proceeded to analyze whether the removal was done because of exigent circumstances. *Tenenbaum*, 193 F.3d at 594-95 (characterizing the removal from school as a "remov[al][of the] child from her ordinary care, custody and management"). Here, T.C.P. was never removed from school grounds during her interview, and was never taken into custody by CPS.

Another line of cases discusses the parents' protected liberty interest in directing the medical care that their child is to receive. *See Tenenbaum*, 193 F.3d at 599 (holding that parents' due process rights were violated by the gynecological examination of their daughter without their consent); *van Emrik v. Chemung Cnty. Dep't of Social Servs.*, 911 F.2d 863, 867 (2d Cir. 1990) ("[T]he constitutional liberty interest of parents in the care, custody, and management of their child, though not beyond limitation, includes a significant decision-making role concerning medical procedures sought to be undertaken by state authority upon their children." (internal quotation marks and citations omitted)). In analyzing whether such a removal comports with procedural due process, the Second Circuit has held that "officials may remove a child from the custody of the parent without consent or a prior court order only in 'emergency' circumstances." *Southerland*, 680 F.3d at 150 (quoting *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir. 1991)). The Second Circuit has further specified that to "show that emergency circumstances existed, '[t]he government must offer objectively reasonable evidence that harm [was] imminent,'" and if the danger is not so imminent that there is reasonable time to "'seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent.'" *Id.* at 149 (quoting *Nicholson*, 344 F.3d at 171).

---

Alternatively, Plaintiffs argue that the alleged seizure of T.C.P. in violation of the Fourth Amendment constitutes a custodial interference. (Pls.' Mem. at 22-23.) However, that the Court has concluded that the interview arguably constituted a "seizure" under the Fourth Amendment is a distinct analysis from whether she was taken from her parents' custody for the purposes of a procedural due process claim. *See Cornigans*, 2006 WL 3950335, at *5-6 (holding that the in-school interview did not constitute a "constructive[] depriv[ation]" of custody, or a "removal . . . triggering due process interests"); *cf. Wofford v. Evans*, 390 F.3d 318, 324-26 (4th Cir. 2004) (holding that a school's detention and questioning of a student on school grounds about a suspected disciplinary violation did not implicate her parents' protected liberty interest in her care, custody and management, even though the detention constituted a seizure for Fourth Amendment purposes).

However, outside of removal or the compulsory provision of medical care, the Second

Circuit has not specified what other kinds of government action may violate a parent's protected

liberty interest in the care, custody, and management of his or her child in the child abuse

context.  Plaintiffs argue that "[t]he right to care, custody and management" of a child includes

"the parents' rights to teach their children not to speak to strangers or anyone else about their

intimate home life and their private parts" as well as "the parents' right to be present to offer

comfort and consolation to their child when being questioned by strangers about intimate family

matters."  (TAC ¶¶ 423-24.)  However, Plaintiffs cite no authority, in the Second Circuit or

elsewhere, suggesting that the type of interview of a minor such as that alleged in this case

violates the parents' right to care, custody, and management of that child, and the process due (if

any) *to the parents* before a child is interviewed without the parents' consent.[28]

As noted, the Second Circuit repeatedly has held that the liberty interest in the care,

custody and management of a child is implicated by removal of the child from the custody of the

parents.  *See, e.g.*, *Southerland*, 680 F.3d at 149 (noting that removal of a child is permitted only

after either a court proceeding or in emergency circumstances); *Nicholson*, 344 F.3d at 171 ("As

a general rule . . . before parents may be deprived of the care, custody, or management of their

children without their consent, due process — ordinarily a court proceeding resulting in an order

permitting removal — must be accorded to them." (alteration in original) (internal quotation

_____

[28] Although outside of the child abuse context, the Fourth Circuit has held that a parent
has no protected liberty interest in being notified before her child is interviewed in school to
investigate the child's suspected disciplinary violation.  *See Wofford*, 390 F.3d at 325
(explaining that there is no "parental stake in a child's freedom from temporary detention at
school for disciplinary purposes," and where at all times, " [the child] remained on school
property, under the auspices of school administrators . . . [the] Constitution does not impose a
duty of parental notification before the pupil's disciplinary detainment while such school
guardianship persists").

marks omitted)); *Tenenbaum*, 193 F.3d at 593-94 (noting that court order or imminent danger to child justifies removal of child). In the face of this authority, lower courts in the Second Circuit have held that to "state a procedural due process claim . . . plaintiffs must allege that the children were removed without parental permission and without Court authorization." *Hollenbeck*, 330 F. Supp. 2d at 332; *see also Williams*, 2007 WL 5463418, at *14 ("[B]ecause plaintiff does not allege that she was ever deprived of custody of [her child], the Fourteenth Amendment procedural due process claim should be dismissed."); *Daniels v. Murphy*, No. 06-CV-5841, 2007 WL 1965303, at *4 (E.D.N.Y. July 2, 2007) (holding that absent any allegation of removal, there is nothing to "trigger" the parents' "entitlement to the 'procedures [that] must be afforded to a parent when the coercive power of the State seeks to separate them' from their children." (alteration in original) (quoting *Kia P.*, 235 F.3d at 759)); *Cornigans*, 2006 WL 3950335, at *5-6 (noting that the procedural due process caselaw relating to child abuse investigations in the Second Circuit is "couched in terms of custody," and holding that to state the violation of a protected liberty interest, plaintiffs must allege a deprivation of custody); *Durven D.*, 2000 WL 1145425, at *7 (dismissing procedural due process claim where police officers never removed children from plaintiff's home "or in any manner interfered with [plaintiff's] control over his children").

However, despite lower courts' focus on deprivations of custody, the Second Circuit also has recognized that the right to the care, custody, and management of one's child encompasses the right to direct that child's medical care, and therefore an infringement of that right can violate a parent's right to procedural due process. *See Tenenbaum*, 193 F.3d at 599; *van Emrik*, 911 F.2d at 867. Additionally, at least one district court in the Second Circuit has held that a parent's liberty interest in the care of her child is implicated when ACS workers visit the home

and conduct strip searches of the child to check for signs of abuse. *See Doe v. Mattingly*, No. 06-CV-5761, 2006 WL 3498564, at *2-3 (E.D.N.Y. Nov. 6, 2006) (holding that "ACS's interference in Wendy Doe's relationship with her infant son without any judicial authorization implicates plaintiffs' rights to procedural due process," and noting that "[w]hile this case involves an interference with the parent-child relationship less severe than removal, . . . the ACS's unauthorized actions with respect to intrusion on the household of Wendy Doe, and the household and body of Baby Doe, are strong evidence of a due process violation"). Therefore, while a physical removal of the child — even for a short duration — might be sufficient to implicate the parents' liberty interest in the child's care, custody, and management for a procedural due process claim, *see, e.g.*, *Tenenbaum*, 193 F.3d at 594-95, such a removal may not be necessary for the parents to claim that government conduct implicates a protected liberty interest, and thus make a threshold showing that their procedural due process rights were violated.

The Second Circuit has not had occasion to fully define the scope of the "care" and "management" prongs of the parent's liberty interest in the care, custody, and management of his or her child. However, the Court has found no authority, within the Second Circuit or without, to support the Parent Plaintiffs' allegations that the "right to care, custody, and management includes the parents' right to teach their children not to speak to strangers . . . about their intimate home life and their private parts," or that this right includes "the parents' right to be present to offer comfort and consolation to their child when being questioned." (TAC ¶¶ 423-24.) Put another way, there is no authority to substantiate the Parent Plaintiffs' claim that the in-school interview of T.C.P., conducted after CPS received a call alleging that T.C.P. was the victim of sexual abuse, violates their liberty interest in her care, custody, and management. *See*

*Cornigans*, 2006 WL 3950335, at *6 ("The plaintiffs have not identified any case holding that interviewing a child at her school in connection with an abuse investigation without the parents' consent or notice constitutes a removal or other interference triggering due process interests, and the court has found none."); *Shapiro*, 2004 WL 2698889, at *14 ("The right to family integrity does not include a constitutional right to be free from child abuse investigations."); *Villanueva v. City of New York*, No. 08-CV-8793, 2010 WL 1654162, at *7 (S.D.N.Y. Apr. 14, 2010) (same); *see also Fowler v. Robinson*, No. 94-CV-836, 1996 WL 67994, at *16 (N.D.N.Y. Feb. 15, 1996) (holding that "even if defendants' removing the . . . children from their classrooms in order to interview them on school grounds constituted a deprivation of custody, it was not sufficiently significant to implicate the constitutionally protected right of family integrity.").

Plaintiffs rely on *Heck*, which in addition to finding a Fourth Amendment violation, held that the plaintiffs' procedural due process rights were violated when CPS employees interviewed the child in school without a court order, a warrant, or consent from the child's parents or the school. *Heck*, 327 F.3d at 527. The specific right infringed in *Heck* was "the plaintiff parents' liberty interest in directing the upbringing and education of their children includ[ing] the right to discipline them by using reasonable, nonexcessive corporal punishment . . . ." *Id.* at 523. In holding that the parents' liberty interest had been infringed by the in-school interview of the child, the Seventh Circuit reasoned that "the fundamental right of parents to direct the upbringing of their children necessarily includes the right to discipline them . . . [and to] delegate that right to private school administrators." *Id.* at 522. But, in *Heck*, the CPS investigation was focused on whether the private school had improperly used corporal punishment against the child. Thus, the Seventh Circuit viewed the conduct of the CPS officials as potentially undermining the parents' choice, through the private school they chose, to use this method of

discipline for their child. *Id.* at 523 (noting that the parents' liberty interest "preclude[s] state officials from interfering with the right of parents to physically discipline their children or to delegate the authority to do so to private school officials, unless there is evidence that the discipline being administered is patently unreasonable or excessive"). The Parent Plaintiffs here make no such claim.

Furthermore, a critical fact in *Heck* that differentiates it from the instant case, is that CPS officials there did not interview the student because they had *any* information of misconduct by the student's parents. Rather, CPS officials were investigating the private school's apparent use of corporal punishment against its students, and, in fact, CPS officials had no information whatsoever implicating the student's *parents* when they interviewed the child. *Id.* at 524 ("Here, because the defendants had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children . . . the defendants violated the plaintiffs' right to familial relations by conducting a custodial interview of [the child] without notifying or obtaining the consent of his parents . . . ."). Here, in contrast, while Plaintiffs view the basis for the interview of T.C.P. as flimsy, to put it charitably, even Plaintiffs acknowledge that those who interviewed T.C.P. did so because of some information (however unreliable it later proved to be) of harm inflicted on T.C.P. by the Parent Plaintiffs. All these differences undercut Plaintiffs' reliance on *Heck*. *See United States v. Hollingsworth*, 495 F.3d 795, 802-03 (7th Cir. 2007) (distinguishing *Heck* from circumstance where public school officials interview student because of concerns about parent, and holding that the latter did not violate parent's right to familial relations).[29]

---

[29] Plaintiffs' reliance on *Patel v. Searles*, 305 F.3d 130 (2d Cir. 2002) is similarly unavailing. Plaintiffs rely on *Patel* to support their claim that the Due Process clause protects more than just physical custody. In *Patel*, the plaintiff claimed that his right to intimate association had been violated because defendant police officers allegedly fabricated evidence and made false accusations implicating him in the murder of his mother and sister, which were

To be clear, it may very well be that the Parent Plaintiffs' liberty interest in the care, custody, and management of T.C.P. could be threatened by government conduct short of her physical removal. But, the Parent Plaintiffs do not allege, for example, that T.C.P. was interviewed as part of some broad dragnet by CPS officials involving large numbers of children about whom there was no information remotely suggesting child abuse. Nor is there any claim that T.C.P. was selected for an interview because of improper profiling or the like. Rather, even the Parent Plaintiffs concede that CPS officials interviewed T.C.P. only after receiving the information they did about possible abuse at home. And, that interview involved nothing other than questions to T.C.P.; there was, for example, no physical search or medical examination of her. While some of the questions asked during the interview involved intimate and sensitive

_____

intended to alienate him from the rest of his family. 305 F.3d at 134. In finding that the plaintiff had stated a claim the *Patel* court cautioned against "formalistic vision[s] of how severe the impairment to the right of intimate association must be" in light of the Supreme Court's "statement that constitutional protections for associational interests are at their apogee when close family relationships are at issue." *Id.* at 137. Thus, even though the defendants had not denied the parent custody of his adult son or otherwise legally severed the relationship of the plaintiff and his other family members, the *Patel* court concluded that plaintiff had stated a claim that his right to intimate association had been violated. *Id.*

However, *Patel* involved a claim for the violation of the right to intimate association, a subset of substantive due process, *see Heck*, 327 F.3d at 517 (noting that a parents' "liberty interest in familial relations" is a "component of 'substantive' due process"); *Wilkinson*, 182 F.3d at 103 (noting that "the Supreme Court [has] recognized that '[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment'" (second alteration in original) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)), and *Patel* did not analyze the plaintiff's claims under a procedural due process framework. Furthermore, although *Patel* found that the plaintiff had stated a claim for the violation of the right to intimate association, the plaintiff there claimed that the actions of defendants "extinguish[ed] his familial relations" with respect to his father and siblings. 305 F. 3d at 137. The Parent Plaintiffs here do not make such a claim. Although they have alleged that the investigation "drove a wedge into the family" and "was devastating" (TAC ¶¶ 306-07), they have not claimed that their relationship with T.C.P. was severed. *See Garten v. Hochman*, No. 08-CV-9425, 2010 WL 2465479, at *5 (S.D.N.Y. June 16, 2010) (distinguishing *Patel* where plaintiffs — in the context of a substantive due process claim — alleged that defendants' conduct "severely strained" the relationship between a parent and his children, as those claims were deemed to be "a far cry from ending the relationship between parent and child").

matters, the Parent Plaintiffs have cited no authority that CPS officials are required to obtain a court order, or pursue other investigative means, before interviewing a child about whom the officials have some information suggesting abuse.

Thus, because the Parent Plaintiffs have not plausibly alleged that the interview of T.C.P. infringed on their right to the care, custody, and management of T.C.P., their fifth cause of action for violation of their right to procedural due process is dismissed.

### 3. Substantive Due Process

In addition to their procedural due process claim, in their sixth, seventh, and eighth causes of action, Plaintiffs also allege violations of their Fourteenth Amendment substantive due process rights. Plaintiffs claim that Defendants' interview of T.C.P. at school violated the Parent Plaintiffs' and T.C.P.'s substantive due process rights (TAC ¶¶ 427-31), and that the County and Village Defendants' subsequent investigation involving the interview of Phillips and Condoluci, the observation of R.S.C.P., and the home inspection, violated the Parent Plaintiffs' substantive due process rights, (*id.* ¶¶ 432-39).[30] As noted, the interest of "parents in the 'care, custody, and management of their child' is a 'fundamental liberty interest protected by the Fourteenth

---

[30] To the extent that Plaintiffs claim that the in-school interview violated T.C.P.'s substantive due process rights, this claim cannot proceed. "Where a particular Amendment provides an 'explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Tenenbaum*, 193 F.3d at 599 (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). Plaintiffs have already alleged a Fourth Amendment claim arising from T.C.P.'s in-school interview on her behalf. Therefore, they cannot allege a substantive due process claim on her behalf arising out of the same set of circumstances. *See id.* at 600 (dismissing substantive due process claim brought on daughter's behalf when the claim was properly analyzed under the Fourth Amendment); *see also Heck*, 327 F.3d at 518 n.23 (same); *Kia P.*, 235 F.3d at 757-58 (same). However, because Condoluci and Phillips do not have cognizable Fourth Amendment claims based on T.C.P.'s interview, "[i]t is therefore appropriate to analyze whether their claims are redressable as substantive due-process violations." *Tenenbaum*, 193 F.3d at 600.

Amendment.'" *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011)

(quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).  Plaintiffs therefore have "a substantive

right under the Due Process Clause to remain together without the coercive interference of the

awesome power of the state." *Tenenbaum*, 193 F.3d at 600 (internal quotation marks omitted).

However, this liberty interest is "limited by the compelling governmental interest in the

protection of children particularly where the children need to be protected from their own

parents, and does not include the right to be free from child abuse investigations." *Heck*, 327

F.3d at 520 (internal quotation marks and citations omitted); *see also Southerland*, 680 F.3d at

152 (noting that "'[a]lthough parents enjoy a constitutionally protected interest in their family

integrity, this interest is counterbalanced by the compelling governmental interest in the

protection of minor children, particularly in circumstances where the protection is considered

necessary as against the parents themselves'" (alteration in original) (quoting *Wilkinson*, 182

F.3d at 104)).

Substantive due process rights protect "against the government's 'exercise of power

without any reasonable justification in the service of a legitimate governmental objective.'"

*Tenenbaum*, 193 F.3d at 600 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

To state a claim for violation of a substantive due process right, a plaintiff must demonstrate that

the state action was "so shocking, arbitrary, and egregious that the Due Process Clause would

not countenance it even were it accompanied by full procedural protection." *Cox*, 654 F.3d at

275 (internal quotation marks omitted); *see also County of Sacramento*, 523 U.S. at 847 ("[T]he

substantive component of the Due Process Clause is violated by executive action only when it

can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."

(internal quotation marks omitted)); *Southerland*, 680 F.3d at 142 (explaining that a substantive

due process "claim can only be sustained if the removal of the child 'would have been prohibited by the Constitution even had the [parents] been given all the procedural protections to which they were entitled.'" (alteration in original) (quoting *Tenenbaum*, 193 F.3d at 600)).  Conduct that is merely "incorrect or ill-advised" is insufficient to state a claim.  *Cox*, 654 F.3d at 275 (internal quotation marks omitted); *see also Cunney v. Bd. of Trustees of Vill. of Grand View*, 660 F.3d 612, 626 (2d Cir. 2011) ("Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." (internal quotation marks omitted)).  Therefore, "'[o]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense,'" and can thus be deemed unconstitutional.  *Cox*, 654 F.3d at 275 (quoting *Tenenbaum*, 193 F.3d at 600); *see also County of Sacramento*, 523 U.S. at 846 ("Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be arbitrary in the constitutional sense . . . ." (internal quotation marks omitted)).

In *Tenenbaum*, the Second Circuit determined that the brief, physical removal of the plaintiff's child from her custody did not violate the plaintiff's substantive due process rights, because the "effort to obtain assurance that [the child] had not been abused [was not] so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection."  193 F.3d at 600; *see also Nicholson*, 344 F.3d at 172 ("[B]rief removals generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal.").  More recently in *Cox*, a school official made a report of suspected child abuse to the Department of Child and Family Services ("CFS").  654

F.3d at 271. Plaintiffs' son was thereafter ordered to undergo a psychiatric evaluation, but was never removed from the parents' custody. *Id*. After it was determined that the concern over the child abuse was unfounded, the parents claimed that the school violated their substantive due process right to custody by making an exaggerated or false report to CFS. *Id.* The Second Circuit rejected plaintiffs' claim, holding that "[w]here there is no actual loss of custody, no substantive due process claim can lie." *Id.* at 276. The court noted that although the school official's "call to CFS and the resulting demands and threats from CFS to the parents may have been stressful or even infuriating," absent a loss of custody, the parents could not state a substantive due process claim. *Id.* at 275-76. Furthermore, in holding that the school official's actions were not sufficiently outrageous to "shock the conscience," the court reasoned that "[c]ommon negligence is categorically insufficient to shock the conscience, so the parents must raise an inference that [the school official] acted maliciously before his call to CFS can even begin to support a violation of substantive due process." *Id.* at 276 (citing *County of Sacramento*, 523 U.S. at 848-49).

In light of the Second Circuit's holding in *Cox*, Plaintiffs have failed to state a viable claim that any of the actions taken by Defendants violated their substantive due process rights, for the simple reason that Plaintiffs never lost custody of T.C.P.[31] Furthermore, Plaintiffs have not stated a plausible claim that Defendants' interview of T.C.P., their asking Phillips and Condoluci to participate in an interview at CPS, their observation of R.S.C.P., or the home visit

---

[31] In *Southerland*, the Second Circuit acknowledged that government conduct can effect a seizure for purposes of the Fourth Amendment, but not constitute a deprivation of custody sufficiently serious to state a substantive due process claim. 680 F.3d at 153 (noting that it "does not follow from the principle that brief seizures of people may be unreasonable and therefore violate the Fourth Amendment that brief removals of children from their parents to protect them from abuse are without any reasonable justification in the service of a legitimate governmental objective under the Due Process Clause" (alteration and internal quotation marks omitted)).

were "even remotely 'outrageous' or 'conscience shocking,'" *id.*, even if these actions

understandably upset the Parent Plaintiffs in this case. The conduct in question, even taking

Plaintiffs' allegations as true, was "in the service of a legitimate governmental objective,"

*Tenenbaum*, 193 F.3d at 600, and Plaintiffs have raised no inference whatsoever that any of the

actions taken by Defendants were malicious, a requirement under *Cox* for a substantive due

process claim to proceed.[32]

---

[32] Additionally, since *Patel* was decided, some courts in the Second Circuit have limited intimate association claims to situations where the state action intentionally targets the family relationship. There "is a cognizable distinction between a state actor that intentionally targets the intimate associations of a person, which is a protected right in [the Second Circuit], and circumstances, such as those presented in the instant action, whereby a state actor allegedly commits actions that indirectly affect those relationships." *Laureano v. Goord*, No. 06-CV-7845, 2007 WL 2826649, at *12 (S.D.N.Y. Aug. 31, 2007); *see also Busch v. City of New York*, No. 00-CV-5211, 2003 WL 22171896, at *5 (E.D.N.Y. Sept. 11, 2003) (limiting *Patel* to "situation where there was an obvious attempt to interfere with the familial relationship by trying to convince certain family members against others in a murder" investigation); *Pizzuto v. Cnty. of Nassau*, 240 F. Supp. 2d 203, 213 (E.D.N.Y. 2002) (noting that "*Patel* represents a category of cases that involves intentional and direct government interference with family relationships"). This is the consensus view among the circuit courts. *See Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 192 (3d Cir. 2009) (holding that "only deliberate executive conduct" would give rise to a familial association violation, and explicitly noting that this rule applied to minor and adult children); *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 585 (8th Cir. 2006) ("A defendant can be held liable for violating a right of intimate association only if the plaintiff shows an intent to interfere with the relationship." (internal quotation marks omitted)); *Russ v. Watts*, 414 F.3d 783, 787-88 (7th Cir. 2005) ("Most courts that have considered the issue have expressly declined to find a violation of the familial liberty interest where the state action at issue was not aimed specifically at interfering with the relationship.") (collecting cases); *J.B. v. Washington Cnty.*, 127 F.3d 919, 927-28 (10th Cir. 1997) (rejecting claim that interview of child during an abuse investigation violated parents' right of familial association where there was no basis to believe that defendants "intended or directed their conduct . . . at the familial relationship . . . with knowledge that such conduct would adversely affect the relationship"); *Soto v. Flores*, 103 F.3d 1056, 1062 (1st Cir. 1997) (holding that parent could not state due process claim based on the death of her minor children where "the defendants' actions, despite the tragic outcome, were not specifically aimed at ending or affecting [plaintiff's] relationship with her children"); *Shaw v. Stroud*, 13 F.3d 791, 805 (4th Cir. 1994) (refusing to extend familial association claim "to encompass deprivations resulting from governmental actions affecting the family only incidentally"). *But see Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) (holding that plaintiff sufficiently alleged violation of her familial association right with the false arrest and extradition of her son) ; *Ward v. City of San*

The Parent Plaintiffs argue that Defendants' actions were conscience shocking and arbitrary because there was no "clear and articulable evidence of abuse," and therefore "'the difficult balancing that caseworkers must perform' between the state's interest in protecting children and the parents liberty interest in the care custody and management of their child never came into play in this case because the Defendants never had reasonable cause to suspect T.C.P. was abused." (Pls.' Mem. 25.) However, as previously discussed, although Plaintiffs make the legal claim that there was no "reasonable cause" to suspect abuse, they cannot deny that Hogle's call to CPS at least created *some* basis to suspect that abuse might have occurred. At most, Plaintiffs have claimed that Defendants were negligent in their handling of the abuse investigation, but they have not alleged sufficient facts to support an inference that Defendants' acts were malicious, such that their actions could "shock the conscience." *See Cox*, 654 F.3d at 276. Therefore, Plaintiffs' sixth, seventh, and eighth causes of action are dismissed.

### 4. Conspiracy to Violate 42 U.S.C. § 1983

In their ninth cause of action, Plaintiffs allege that a conspiracy to violate § 1983 existed among the County of Orange, the Village of Goshen, and the Goshen Central School District Board of Education, in connection with the interview of T.C.P. (TAC ¶¶ 440-48.) To establish a claim for a §1983 conspiracy, Plaintiffs must demonstrate: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292

---

*Jose*, 967 F.2d 280 (9th Cir. 1991) (finding that parents were proper plaintiffs in familial association claim stemming from death of their son). Plaintiffs have not alleged that Defendants interviewed T.C.P., or conducted the investigation they did, with the intent to separate or alienate T.C.P. from her parents, or vice versa. At most, Plaintiffs allege that Defendants did not have reasonable cause to believe that T.C.P. had been the victim of abuse by her parents. (TAC ¶¶ 119, 125, 131, 138-41, 341-44.)

F.3d 307, 324-25 (2d Cir. 2002). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his [or her] constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Id.* at 325 (internal quotation marks omitted); *see also Sudler v. City of New York*, No. 08-CV-11389, 2010 WL 68095, at *12 (S.D.N.Y. Jan. 8, 2010) ("'[C]onclusory' allegations of conspiracy are insufficient to survive a motion to dismiss." (citing *Iqbal*, 556 U.S. at 678)), *adopted by* 2010 WL 726964 (S.D.N.Y. Feb 19, 2010). Plaintiffs also must plausibly allege that Defendants have violated their constitutional rights. *See Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (holding that without an underlying § 1983 violation, a claim for conspiracy must fail); *Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at *19 (S.D.N.Y. Mar. 8, 2012) ("'[A] violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right.'" (quoting *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y.2000))). Here, Plaintiffs have plausibly alleged that the interview of T.C.P. violated her Fourth Amendment right to be free from unreasonable seizures.[33]

Plaintiffs have stated a § 1983 conspiracy claim against the School District, the County of Orange, and the Village of Goshen. First, Plaintiffs have adequately alleged an agreement, or a "meeting of the minds" between the defendants. *See Romer*, 119 F. Supp. 2d at 363 (noting that to survive a motion to dismiss, a "plaintiff must provide some factual basis supporting a meeting of the minds" between the defendants (internal quotation marks omitted)); *see also Edwards*, 2012 WL 760172, at *19 ("[A] plaintiff must show that defendants acted in a willful

---

[33] Although Plaintiffs have also stated a plausible claim that the home inspection constituted an unreasonable search in violation of the Parent Plaintiffs' Fourth Amendment rights, their § 1983 conspiracy claim only relates to T.C.P.'s in-school interview.

manner, culminating in an agreement, understanding, or meeting of the minds . . . ." (alteration in original) (internal quotation marks omitted)). With respect to the School District, Plaintiffs have alleged that the School District was instructed by the New York State Department of Education to become familiar with CPS policy concerning interviews of children in school (TAC ¶ 443), and that the School District, knowing that the County of Orange multidisciplinary teams were conducting criminal investigations of the parents concurrently with the CPS investigations of abuse, allowed such teams into the school "for the purpose of investigating parents," (*id.* ¶¶ 444). These allegations suggest an agreement between the School District and the County of Orange, whereby the School District would allow the multidisciplinary teams to question students on school grounds without inquiring whether the teams had reasonable cause to suspect abuse, or whether they had obtained parental consent or a court order. (*Id.* ¶¶ 137-41.)

With respect to the County of Orange and the Village of Goshen, Plaintiffs have asserted that the protocols — jointly developed by the County and the Village and used by multidisciplinary investigative teams — unconstitutionally permitted children to be interviewed in school without reasonable cause to suspect abuse, without parental consent, and without a court order. (TAC ¶¶ 445-48.) This includes the protocol that provides for conducting interviews of children in school as the first step in all investigations without reasonable or probable cause to suspect abuse, and without parental consent, a court order, or exigent circumstances (*id.* ¶ 445), as well as failing to disclose the fact that police officers are involved and are concurrently conducting a criminal investigation with the abuse investigation, (*id.* ¶ 446-47). These allegations meet the first element, that the state actors have an agreement, as the facts alleged support a "meeting of the minds" between the County and the Village in the joint development of these protocols. *Romer*, 119 F. Supp. 2d at 363; *see also Bertuglia v. City of*

*New York*, 839 F. Supp. 2d 703, 728 (S.D.N.Y. 2012) ("'A plaintiff must allege facts that plausibly suggest a 'meeting of the minds' and provide some details of time and place.'" (quoting *AK Tournament Play, Inc. v. Town of Wallkill*, No. 09-CV-10579, 2011 WL 197216, at *3 (S.D.N.Y. Jan.19, 2011))).

As to the second element, it is unclear whether the Second Circuit requires specific intent to be demonstrated in § 1983 conspiracy claims. Courts in other circuits are much more explicit about this requirement, holding that a plaintiff must allege that the government entities acted with specific intent to violate the plaintiff's rights. *See Luciano v. Fago*, No. 09-CV-01362, 2010 WL 4853643, at *3 (M.D. Pa. Nov. 23, 2010) (requiring allegations that defendants acted with specific intent to violate plaintiffs' constitutional rights); *Irby v. Hodge*, No. 09-CV-223, 2010 WL 4259942, at *4 (S.D. Miss. Oct. 21, 2010) (same); *BPNC, Inc. v. Taft*, No. 02-CV-7620, 2003 WL 21479169, at *4 (N.D. Ohio June 18, 2003) (same), *aff'd*, 147 F. App'x 525 (6th Cir. 2005). Several district courts within the Second Circuit have not read in a requirement of specific intent, holding only that "'a plaintiff must demonstrate that a defendant acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated the plaintiff's rights.'" *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 331 (E.D.N.Y. 2010) (quoting *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y.1995)), *aff'd*, 417 F. App'x 96 (2d Cir. 2011); *see also Edwards*, 2012 WL 760172, at *19 (same); *Peoples v. Fischer*, No. 11-CV-2694, 2011 WL 6034374, at *3 (S.D.N.Y. Dec. 1, 2011) (same); *Bussey v. Phillips*, 419 F. Supp. 2d 569, 586-87 (S.D.N.Y. 2006) (same); *cf. Manbeck v. Micka*, 640 F. Supp. 2d 351, 382 (S.D.N.Y. 2009) (noting that a § 1985 conspiracy is "[n]arrower in scope" than a § 1983 conspiracy because in a § 1985 conspiracy, "the plaintiff must also provide evidence that Defendants acted in concert with a racial or discriminatory animus." (internal quotation marks

omitted)).[34] This interpretation contemplates that Defendants must intend to enter into an agreement and act in concert, and that the joint venture culminates in the violation of Plaintiffs' constitutional rights, not that Defendants must have the specific intent to violate Plaintiffs' constitutional rights when entering into that agreement. Therefore, because Plaintiffs have pled sufficient facts to demonstrate that the School District, the Village, and the County "acted in concert" and have pled that their acts violated T.C.P.'s Fourth Amendment rights, they have met the second element.

Finally, Plaintiffs have adequately alleged that the in-school interview conducted by Defendants Scali-Decker and Scolza was an overt act in furtherance of the conspiracy. *See Mitchell v. Cnty. of Nassau*, 786 F. Supp. 2d 545, 565 (E.D.N.Y. 2011) ("Allegations of

---

[34] However, in *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147 (2d Cir. 2006), the Second Circuit dismissed a § 1983 conspiracy claim against a federal authority for acting in concert with a state authority to engage in First Amendment retaliation against the plaintiff, because "[t]here [was] no evidence suggesting that the federal defendants acted based on an unconstitutional animus as opposed to a spirit of cooperation." *Id.* at 155. Although that case suggests that specific intent to violate the plaintiff's civil rights is necessary for the conspiracy claim, it is distinguishable from the instant case. Retaliatory intent is a prerequisite for finding liability for First Amendment retaliation, and the Second Circuit held that plaintiffs "produced sufficient evidence of retaliatory motive to survive summary judgment [against the state officials]" on their First Amendment retaliation claims. *Id.* at 153. However, the Second Circuit found that there was "insufficient evidence" to implicate the federal defendants in the state officials' allegedly improper actions, and explained that "[c]ooperation between state and federal bureaucracies acting in their regulatory spheres supports no inference that the federal actors acted with an improper motive." *Id.* at 154. In contrast, here, Plaintiffs have plausibly stated a claim that the County, Village, and School District violated T.C.P.'s Fourth Amendment rights, and intent is not a necessary element of the Fourth Amendment claim. *See Davis v. United States*, 131 S. Ct. 2419, 2439 (2011) ("'Surely many more Fourth Amendment violations result from carelessness than from intentional constitutional violations'" (quoting 1 W. LaFave, Search and Seizure § 1.3, at 64 (4th ed. 2004))); *Brendlin v. California*, 551 U.S. 249, 260-61 (2007) (explaining that the official's subjective intent is not relevant in determining whether an individual is seized under the Fourth Amendment); *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Therefore, the Court declines to read in an element of specific intent for Plaintiffs' conspiracy claim based on *Beechwood*.

conspiracy must 'allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the alleged conspiracy.'" (quoting *Fariello v. Rodriguez*, 148 F.R.D. 670, 677 (E.D.N.Y.1993), *aff'd*, 22 F.3d 1090 (2d Cir. 1994)). Therefore, Plaintiffs have pled sufficient facts to state a claim that the School District, County and Village engaged in a conspiracy to violate their constitutional rights.

### 5. Qualified Immunity

Scali-Decker, Scolza, and Jankowski each argues that he or she entitled to the defense of qualified immunity from Plaintiffs' claims.[35] In deciding whether to grant a government

---

[35] All of the Individual Defendants have been sued in their individual and official capacities. The qualified immunity analysis only applies to individual capacity suits. *See Brandon v. Holt*, 469 U.S. 464, 468, 470-72 (1985) (explaining that officials may be shielded by qualified immunity when sued in their individual capacities, but that qualified immunity does not apply to actions brought against officials in their official capacities, because an official capacity suit is a suit against the municipality); *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011) ("[B]ecause a claim asserted against a government official in his official capacity is essentially a claim against the governmental entity itself, the defense of qualified immunity, which may be available to individual defendants as they are sued in their individual capacities, is not applicable to claims against them in their official capacities.").

Furthermore, to the extent the Individual Defendants have been sued in their official capacities, these suits should be dismissed, because the municipal entities are the real parties in interest, and thus "a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "'As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.'" *O'Connor v. Pierson*, 568 F.3d 64, 71 (2d Cir. 2009) (quoting *Graham*, 473 U.S. at 166); *see also Brandon*, 469 U.S. at 471-72 (noting that, as long as a municipal entity had notice of the suit, a judgment against an agent of the entity is a judgment against the entity). Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant. *See, e.g.*, *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 700 (S.D.N.Y. 2011) (dismissing claims against the Mayor, the City Council, and its members as redundant); *Carmody v. Vill. of Rockville Ctr.*, 661 F. Supp. 2d 299, 329 (E.D.N.Y. 2009) (dismissing official capacity claims as redundant); *Drees v. Cnty. of Suffolk*, No. 06-CV-3298, 2007 WL 1875623, at *19 (E.D.N.Y. June 27, 2007) (dismissing official capacity claims as "duplicative"); *Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 264 n.2 (S.D.N.Y. 2006) (dismissing official capacity claims as redundant where municipal entity was also a defendant); *Rini v. Zwirn*, 886 F. Supp. 270, 281-82 (E.D.N.Y. 1995) (dismissing official capacity claims and

official's motion on qualified immunity grounds, a court conducts a two-part inquiry. The court may ask whether "the facts, viewed in the light most favorable to the plaintiff, show that the [official's] conduct violated a constitutional right." *Gilles v. Repicky*, 511 F.3d 239, 244 (2d Cir. 2007) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Even "if the plaintiff has satisfied th[at part], the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson*, 555 U.S. at 232.[36] "If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." *Gilles*, 511 F.3d at 244; *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 367 (2001) ("Qualified immunity was created to shield government officials from civil liability for the performance of discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))); *Tenenbaum*, 193 F.3d at 595-96 ("The qualified immunity doctrine protects government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively unreasonable." (internal quotation marks omitted)).

In determining if a right is clearly established, the Court looks to "whether (1) it was

---

noting that "any official-capacity § 1983 claim against the[] town employees is a redundant method of stating a claim against the Town itself"). Therefore, all claims against the Individual Defendants in their official capacities are dismissed.

[36] Until recently, courts were required to perform the two-part qualified immunity inquiry in order, first asking whether the defendant violated a constitutional right and, if so, then asking whether that right was "clearly established." *See Saucier*, 533 U.S. at 201. Following the Supreme Court's decision in *Pearson*, however, courts may now decide the order in which to conduct the qualified immunity analysis. *See Pearson*, 555 U.S. at 236.

defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the

existence of the right, and (3) a reasonable defendant would have understood that his conduct

was unlawful." *See Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). "The question is not

what a lawyer would learn or intuit from researching case law, but what a reasonable person in

[the] defendant's position should know about the constitutionality of the conduct." *Young v.

Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). The Supreme Court instructs that

> [t]o be clearly established, a right must be sufficiently clear that every reasonable
> official would [have understood] that what he is doing violates that right. In other
> words, existing precedent must have placed the statutory or constitutional
> question beyond debate. . . . [T]he right allegedly violated must be established,
> not as a broad general proposition, but in a particularized sense so that the
> contours of the right are clear to a reasonable official.

*Reichle v. Howards*, 132 S. Ct. 2088, 2093-94 (2012) (second alteration in original) (citations

and internal quotation marks omitted). Moreover, when a qualified immunity defense is

asserted, a court should consider the specific scope and nature of a defendant's qualified

immunity claim. In particular, a determination of whether the right at issue was "clearly

established" must be undertaken "in light of the specific context of the case, not as a broad

general proposition." *Saucier*, 533 U.S. at 201. Thus, the qualified immunity analysis must be

"'particularized'" in the sense that "'[t]he contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right. This is not to say

that an official action is protected by qualified immunity unless the very action in question has

previously been held unlawful; but it is to say that in the light of pre-existing law the

unlawfulness must be apparent.'" *Zieper v. Metzinger*, 474 F.3d 60, 68 (2d Cir. 2007) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Reichle*, 132 S. Ct. at 2094 (noting

that the right at issue must be established "in a particularized sense so that the contours of the

right [were] clear to a reasonable official" (internal quotation marks omitted)).

The only remaining claim against the Individual Defendants is the Fourth Amendment illegal seizure claim arising from T.C.P.'s in-school interview.[37]  Therefore, as an initial matter, "the facts, viewed in the light most favorable to the plaintiff, show that the [official's] conduct violated a constitutional right."  *Gilles*, 511 F.3d at 244 (quoting *Walczyk*, 496 F.3d at 154).  The issue, therefore, is whether it was "clearly established" in the Second Circuit that the in-school interview of T.C.P., if conducted without probable cause or reasonable suspicion, parental consent, a court order, or exigent circumstances, could constitute a violation of her Fourth Amendment rights.  Defendants claim that there is no clearly established right which requires CPS workers to obtain a warrant, court order, or parental consent prior to conducting an interview of a child on school grounds in a suspected case of abuse.  (Village Defs.' Mem. 19.) Plaintiffs assert that the clearly established right involved here is the right to be free from an investigation into allegations of child abuse where there is no "reasonable cause" to believe that the allegations are true.  (Pl.'s Mem. 43.)

In addressing this point, it bears noting that the Second Circuit has observed that:

[P]rotective services caseworkers [must] choose between difficult alternatives. . . . If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights.  If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights.  It is precisely the function of qualified immunity to protect state officials from choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.

*Tenenbaum,* 193 F.3d at 596 (quoting *van Emrik*, 911 F.2d at 866 (footnote omitted)).  The investigation at issue in the instant action was prompted by an anonymous phone call made to the SCR, and this information was relayed to CPS.  Plaintiffs contend that this phone call was

---

[37] The Parent Plaintiffs' claim that the home inspection constituted an unlawful search was only brought against the County of Orange, and did not name any of the Individual Defendants.

insufficient to raise at least a "reasonable" suspicion of child abuse. (Pl.'s Mem. 43.) The Village Defendants argue that there is no "clearly established requirement that reasonable cause be present to merely initiate investigation into a child abuse complaint by interviewing a child without parental consent." (Village Defs.' Reply Mem. of Law in Further Supp. of their Mot. To Dismiss 5.) The County Defendants also contend that nothing in the call made by Hogle was so nonsensical that it did not warrant the "modest" investigation undertaken by Defendants. (Cnty. Defs.' Reply of Law 9-10.) At this stage of the litigation, and in the qualified immunity context, however, the Court need not resolve whether the anonymous phone call was sufficient to provide CPS with reasonable suspicion or probable cause to investigate Plaintiffs' affairs because the Court finds that the right at issue here is not clearly established.

The Second Circuit has not addressed whether the in-school interview of a child suspected of abuse — absent probable cause or reasonable suspicion, parental consent, a court order, or exigent circumstances — constitutes a violation of the child's Fourth Amendment rights. However, Plaintiffs rely on the Seventh Circuit's decision in *Heck* to support their contention that T.C.P.'s Fourth Amendment rights were violated.[38] While *Heck* held that the child's Fourth Amendment rights had been violated by the in-school interview, the court nonetheless determined that the individual defendants were entitled to qualified immunity because they had acted pursuant to a statute which allowed caseworkers to interview children, in

---

[38] Plaintiffs also cite to *Kia P.*, 235 F.3d at 762 to support their claim that T.C.P. was "seized" during the in-school interview. (Pls.' Mem. 31.) However, in *Kia P.*, the child was held in the hospital, and her parents were not free to take her. The Second Circuit held that this constituted a "seizure" because it was clear to her mother that the child was not free to leave the hospital. The Second Circuit's analysis in *Kia P.* was based on a physical withholding of the child from the parents' custody. *Id.* at 762. The court, in any event, found no Fourth Amendment violation because the seizure was reasonable. *Id.* at 763. Conversely, here, the Parent Plaintiffs' custody of T.C.P. was never interrupted by the in-school interview.

connection with child abuse investigations, at any location and without parental consent (a statute that the court found to be unconstitutional). 327 F.3d at 515-16. Furthermore, because *Heck* is a Seventh Circuit case, its holding does not demonstrate the existence of a clearly established right in the Second Circuit. *See Young*, 160 F.3d at 903 (explaining that in the qualified immunity analysis, the Second Circuit "puts significant weight on whether or not the law was governed by controlling precedent of th[e] [Second] Circuit").

Plaintiffs also cite to *Greene v. Camreta*, which had held that an in-school interview of a child during an abuse investigation violated the child's Fourth Amendment rights. 588 F.3d 1011, 1031 (9th Cir. 2009)*, vacated* 131 S. Ct. at 2035-36. That portion of *Greene* has since been vacated by the Supreme Court, 131 S. Ct. at 2035-36, but significantly, the Ninth Circuit had granted qualified immunity to the individual defendants because no precedent in the Ninth Circuit existed that clearly established the fact that the in-school seizure at issue would have been subject to Fourth Amendment protection. 588 F.3d at 1033. In fact, courts in other circuits that recently have found that in-school interviews of children implicate their Fourth Amendment rights have similarly granted qualified immunity to the caseworkers involved. *See, e.g., Stoot*, 582 F.3d at 922 (finding that in-school interview of child suspected of abusing another violated Fourth Amendment but granting qualified immunity because it was not clearly established that the officer could not rely on alleged victim's statements to create probable cause); *Loftus*, 2009 WL 1956319, at *3, 7 (assuming for purposes of motion that in-school interview of child was a seizure, but granting qualified immunity for defendants because right was not "clearly established," as the court "found no cases in the United States Supreme Court, the Court of Appeals for the Eleventh Circuit or the Supreme Court of Florida addressing the issue of whether the interrogation of a child on school property and without parental consent constitutes an

unreasonable seizure"); *Word of Faith Fellowship*, 329 F. Supp. 2d at 691 (granting qualified immunity because the right of children to be free from interviews conducted without parental consent was not clearly established in the Fourth Circuit). Here, similarly, no Supreme Court or Second Circuit precedent exists that clearly establishes a right to Fourth Amendment protection during an interview on school grounds. As previously discussed, the Second Circuit cases that have found that CPS actions implicated a child's Fourth Amendment rights have involved physical removals of the child. In the "specific context of [this] case," therefore, the "contours of the right [are not] sufficiently clear [such] that a reasonable official would understand that" the in-school interview of T.C.P. could implicate her Fourth Amendment rights. *Doninger*, 642 F.3d at 345-46 (internal quotation marks omitted).

Furthermore, the Individual Defendants were acting pursuant to a statute akin to the one cited in *Heck*. New York Social Services Law § 421 provides that the New York State Office of Children and Family Services shall promulgate regulations to be followed by local social services departments and issue guidelines for these departments which set forth, among other things, the conditions under which children may be contacted and interviewed by caseworkers. N.Y. Soc. Serv. Law § 421(3). Contained in the Program Manual promulgated by the Office of Children and Family Services is a statement that "[n]othing in law prevents Child Protective Services from speaking with the child prior to and/or without the permission of the parents." (Letter from Matthew J. Nothnagle, Esq. to the Court, Ex. A (Mar. 12, 2010) (Dkt. No. 13).)[39]

---

[39] The Court may take judicial notice of these state agency-promulgated guidelines in deciding a motion to dismiss. *See T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11-CV-5133, 2012 WL 860367, at *3 (S.D.N.Y. Feb. 27, 2012) (noting in a motion to dismiss that court may take judicial notice of state-promulgated regulations and guidelines); *McGRX, Inc. v. Vermont*, No. 10-CV-1, 2011 WL 31022, at *1 n.1 (D. Vt. Jan. 5, 2011) ("Many cases have recognized that a Court may take judicial notice of the rules, regulations and orders of administrative agencies issued pursuant to their delegated authority." (quoting *Int'l Bhd. of*

Thus, it was not unreasonable for the Individual Defendants to believe that their conduct in interviewing T.C.P. at her school without parental consent did not violate her Fourth Amendment rights, and they are entitled to qualified immunity against that claim.

Therefore, Individual Defendants Scali-Decker, Scolza, and Jankowski are dismissed from this action.[40]

### 6. Municipal Liability

Lastly, the Court notes that Plaintiffs may bring claims against each of the municipal Defendants for the alleged violations of their Fourth Amendment rights. "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of

---

*Teamsters v. Zantop Air Transp. Corp.*, 394 F.2d 36, 40 (6th Cir.1968))); *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales*, 701 F. Supp. 2d 356, 368 (E.D.N.Y. 2010) ("Courts have taken judicial notice of regulations and their contents to measure the standard of defendant's behavior . . . including an enforcement handbook . . . .").

[40] Furthermore, even had the Court found that the Parent Plaintiffs stated a claim that the interview of T.C.P. violated their procedural due process rights, the Individual Defendants would nevertheless be entitled to qualified immunity. It is hardly "clearly established" that the facts in this case — where a child was subjected to an interview with caseworkers, in the presence of a school official and on school grounds, but without a court order, warrant, or parental consent — can give rise to liability for violations of the parents' procedural due process rights. *See Cornigans*, 2006 WL 3950335, at *8 (noting that there was no case suggesting that interviewing a child in school, even without parental notice, constituted a violation of a parent's constitutional right to the custody of that child or any procedural due process rights, and thus that it was objectively reasonable for the defendant to believe that his actions in interviewing the child did not violate the plaintiff's rights). Since *Cornigans* was decided, no Supreme Court or Second Circuit decision has held that such circumstances constitute a violation of procedural due process under the Fourteenth Amendment, and thus Phillips' and Condoluci's right to be notified before the occurrence of such an interview was not clearly established at the time that it occurred.

law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) ("A municipality may be liable under § 1983 only 'if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person to be subjected to such deprivation.'" (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011))). In other words, a municipality may not be liable under Section 1983 "by application of the doctrine of *respondeat superior*." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnmental bodies can act only through natural persons . . . [and] governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

Moreover, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [government]." *Newton*, 566 F. Supp. 2d at 271; *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*,

200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). In the end, therefore, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe*, 542 F.3d at 37 (quoting *Brown*, 520 U.S. at 404).

Plaintiffs allege that the in-school interview of T.C.P. was conducted pursuant to policies instituted by each municipal agency that allowed for the in-school questioning of children suspected of being abused without parental consent or probable or reasonable cause to believe that such abuse had occurred. (TAC ¶¶ 119-20, 125-26, 140-41, 162-64, 319-28.)[41] The Village of Goshen, on the other hand, asserts that a § 1983 claim cannot be brought against it, because it does not have a department of social services, as understood under the Social Services Law, and therefore could not possibly have instituted a policy or custom that harmed Plaintiffs. (Village

---

[41] The School District, while not denying that it had a policy in place that allowed for CPS to interview children suspected of abuse in its schools, argues that for a claim to proceed against it, such policy must be the "'moving force [behind] the constitutional violation.'" (Sch. Dist. Defs.' Mem. 16. (emphasis omitted)) The School District claims that its actions were not the "moving force" behind Plaintiffs' alleged constitutional violations, and thus it should not be held liable. (*Id.* at 17.) The District does not expand on this assertion, or explain why its policy should not be considered a moving force behind Plaintiffs' alleged injuries. However, Plaintiffs have adequately alleged that the School District had a policy in place that allowed for CPS to interview children in the schools without establishing probable cause or reasonable suspicion, and without a court order, parental consent, or exigent circumstances. This policy was a "moving force" behind plaintiffs' alleged injuries because that policy allowed for CPS to interview T.C.P. in her school, thus plausibly establishing a causal link between the School District's policy and Plaintiffs' alleged injuries. *See Brown*, 520 U.S. at 404 (explaining that to demonstrate that municipality was the "moving force" behind plaintiff's injuries "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights"); *City of Canton*, 489 U.S. at 391 (noting that for *Monell* liability to attach, the municipal policy must be "closely related to the ultimate injury"); *Cash*, 654 F.3d at 342 (explaining that "'proximate cause,' although derived from tort law, fairly describes a plaintiff's causation burden with respect to a municipal liability claim under § 1983").

71

Defs.' Mem. 21-23.)  However, as Plaintiffs point out, Scolza is an officer with the Village of

Goshen Police Department and was working with Scali-Decker, an employee of the County of

Orange CPS, as a member of a multidisciplinary investigative team created pursuant to New

York Social Services Law § 423(6), which allows local departments of social services to work

with representatives of other agencies, including law enforcement agencies, when conducting

child abuse investigations.  (TAC ¶¶ 20-25, 86.)  Such teams must act pursuant to a written

protocol, which, in this case, Plaintiffs claim allowed for the interview of T.C.P. without parental

consent, and, allegedly, without probable cause or reasonable suspicion to suspect that any abuse

had occurred.  (*Id.* ¶ 325.)  Furthermore, Plaintiffs allege that the intermunicipal agreement

between the County and the Village is signed by the Village mayor, an individual with

supervisory and policy making authority over Village police officers pursuant to New York

Village Law § 4-400, and that pursuant to the intermunicipal agreement, the Village is

contractually obligated to participate in abuse investigations at the County's request and

according to the team protocol.  (*Id.* ¶¶ 320-21.)  Plaintiffs have alleged that the written protocol,

in turn, is developed by the multidisciplinary team, which in this case consisted of the County of

Orange CPS and the Village of Goshen Police Department.  (*Id.* ¶ 24.)  Therefore, because it was

contemplated that such a protocol would be jointly created and administered between the local

department of social services and the law enforcement agency — in this case, between the

County of Orange CPS and the Village of Goshen Police Department — the Village of Goshen

may be liable under § 1983.  Defendants' motions to dismiss the municipal liability claims,

therefore, are denied.

### III. Conclusion

For the reasons stated herein, Defendants' motions to dismiss are granted in part and denied in part. All claims against the Individual Defendants are dismissed, as are Plaintiffs' substantive due process claims, Parent Plaintiffs' procedural due process claims, and Parent Plaintiffs' Fourth Amendment search claims related to their interview at CPS and T.C.P.'s in-school interview. Defendants' motions to dismiss all other claims are denied. The Clerk of the Court is respectfully directed to terminate the pending motions. (Dkt. Nos. 57, 60, & 65.)

SO ORDERED.

Dated:     White Plains, New York
           September ⎵⎵, 2012

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

73

Service List (via ECF):

Marie Condoluci, Esq.
Marie Condoluci, PLLC
60 Erie Street, Suite 401
Goshen, NY 10924
(845) 591-5563
mcondoluci@optonline.net
*Counsel for Plaintiffs*

Matthew Joseph Nothnagle, Esq.
Orange County Attorney
255 Main Street, County Government Center
Goshen, NY 10924
845-291-3150
mnothnagle@co.orange.ny.us
*Counsel for County Defendants*

Lewis R. Silverman, Esq.
Samantha Velez, Esq.
Rutherford & Christie, LLP
369 Lexington Avenue, 8th Floor
New York, NY 10017
212-599-5799
lrs@rutherfordchristie.com
sv@rutherfordchristie.com
*Counsel for School District Defendants*

Adam I. Kleinberg, Esq.
Anthony Francisco Cardoso, Esq.
Sokoloff Stern LLP
355 Post Avenue, Suite 201
Westbury, NY 11590
(516) 334-4500
akleinberg@sokoloffstern.com
acardoso@sokoloffstern.com
*Counsel for Village Defendants*